IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| HYC LOGISTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-02050-TLP-tmp |
| v. | ) | |
| | ) | |
| OJCOMMERCE, LLC, doing business as OJ | ) | |
| Commerce, LLC, and JACOB WEISS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING MOTIONS TO DISMISS AND GRANTING MOTION TO CONSOLIDATE

Plaintiff HYC Logistics, Inc. ("HYC") sued Defendants OJCommerce, LLC ("OJCommerce") and Jacob Weiss ("Weiss") here in February 2023. (ECF No. 1.) HYC's complaint asks the Court, among other things, to declare the parties' rights under an alleged contract. (*See id.*) Defendants then moved to dismiss. (*See* ECF Nos. 20, 21.)

Before HYC brought this case, OJCommerce sued 562 Express, Inc.—a party that HYC allegedly hired to fulfill HYC's duties under the contract—in the Central District of California. The Central District of California transferred OJCommerce's case to this Court. HYC and 562 Express, Inc. then moved to consolidate both cases. (ECF No. 29.)

For the reasons below, the Court **DENIES** Defendants' motions to dismiss and **GRANTS** the motion to consolidate.

## BACKGROUND

HYC agreed to arrange the transportation of OJCommerce's goods from the Port of Los Angeles under a service contract ("Contract"). (*See* ECF No. 1.) HYC "is a family owned and

operated" Tennessee corporation based in Shelby County, Tennessee.  (*Id.* at PageID 1.)  It provides "freight forwarding and customs services to international and domestic companies alike."  (*Id.*)

According to HYC's complaint, "OJCommerce, which is owned and operated by Defendant Weiss, [is] . . . an e-commerce company which imports a variety of products, manufactured overseas, for domestic internet sale."  (*Id.* at PageID 2.)  OJCommerce is also a limited liability company organized under Delaware law with its principal place of business in Florida.  (*Id.* at PageID 4.)  Weiss is OJCommerce's owner, President, CEO, and registered agent for service of process, and he resides in Florida.  (*Id.*)

In August 2022, HYC and OJCommerce executed the Contract.  (*Id.* at PageID 7.)  And under that Contract, HYC would arrange for, among other things, "pick-up and ground transportation to a storage facility" of international shipping containers holding OJCommerce's goods.  (*Id.*)  To fulfill its obligations, HYC engaged a trucking company, 562 Express, Inc. ("562 Trucking"), to pick up and deliver shipping containers.  (*Id.* at PageID 12.)  Under the Contract, HYC would hire third parties like 562 Trucking to help HYC handle, transport, and deliver shipments of OJCommerce's goods.  (*Id.*)

The dispute here stems from HYC dispatching 562 Trucking to pick up nine shipping containers filled with OJCommerce's imported goods from the Port of Los Angeles in December 2022 ("December Job").  To decide the issues in these Motions, the Court will review the Contract, the parties' course of performance, the December Job, and the procedural history.

## I.     The Contract

The Contract's terms of service are between the "Company" and the "Customer."  (ECF No. 1-2 at PageID 33.)  The Contract defines "Company" as "HYC Logistics, Inc., its

subsidiaries, related companies, agents and/or representatives[.]" (*Id.*)  And it defines "Customer" as:

> [T]he person for which the Company is rendering service, as well as its principals, agents and/or representatives, including, but not limited to, . . . importers, exporters, . . . buyers and/or sellers . . . shipper's agents, . . . consignees, etc.  It is the responsibility of the Customer to provide notice and copy(s) of these terms and conditions of service to all such agents or representatives[.]"

(*Id.*)  And under the Contract, HYC, "as the 'agent' of the Customer[,]" agreed to ensure OJCommerce's shipping containers were picked up from the United States' port where it was shipped.  (*See id.*; ECF No. 1 at PageID 7.)  HYC also agreed to arrange the shipment of that container "to a storage facility so designated by OJCommerce."  (ECF No. 1 at PageID 7.)

HYC claims that it negotiated payment terms with Weiss via email before the first delivery.  (*Id.*)  Typically, HYC would arrange for the pickup and transportation of OJCommerce's shipment and then email an invoice with the amount owed to OJCommerce.  (*Id.* (citing, as an example, ECF No. 1-3).)  In Section 13, the Contract addresses disputes about "monies owed" to HYC: "[T]he Company shall be entitled to all costs of collection, including reasonable attorney's fees and interest at *5.0*% per annum or the highest rate allowed by law, whichever is less unless a lower amount is agreed to by Company."  (ECF No. 1-2 at PageID 35.)

Because OJCommerce did not pay, HYC alleges it has exercised its "contractual lien rights to retain" the nine shipping containers 562 Trucking picked up from the Port of Los Angeles.  HYC argues its behavior is proper under the Contract's Section 14:

> (a)   Company [HYC] shall have a continuing lien on any and all property and documents relating thereto of Customer [OJCommerce] coming into Company's actual or constructive possession, custody or control or enroute, which lien shall survive delivery, for all charges, expenses or advances owed to Company with regard to the shipment on which the lien is claimed, a prior shipment(s) and/or both.  Customs duties, transportation charges, and related payments advanced by

the Company shall be deemed paid in trust on behalf of the Customer and treated as pass through payments made on behalf of the Customer for which the Company is acting as a mere conduit.

      (b)    Company shall provide written notice to Customer of its intent to exercise such lien, the exact amount of monies due and owing, as well as any on-going storage or other charges; Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.

      (c)    Unless, within thirty days of receiving notice of the lien, Customer posts cash or letter of credit at site, or, if the amount due is in dispute, an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell such shipment(s) at public or private sale or auction and any net proceeds remaining thereafter shall be refunded to Customer.

(*Id.*)

What is more, the Contract has a forum selection clause.  Section 23 is titled "Governing Law; Consent to Jurisdiction and Venue."  And that section provides:

These terms and conditions of service and the relationship of the parties shall be construed according to the laws of the State of <u>TN</u> without giving consideration to principles of conflict of law.  Customer and Company:
      (a) irrevocably consent to the jurisdiction of the United States District Court and the State courts of <u>TN</u>;
      (b) agree that any action relating to the services performed by Company shall only be brought in said courts;
      (c) consent to the exercise of in personam jurisdiction by said courts over it; and
      (d) further agree that any action to enforce a judgment may be instituted in any jurisdiction.

(*Id.* at PageID 36.)

Finally, the Contract has a place for one signature at the bottom of its final page.  "OJ Commerce, LLC" appears on a line next to the word "Name."  (*Id.*)  Weiss's signature appears on a line next to the word "Signature" with the date, August 15, 2022.  (*Id.*)

## II.     The Parties' Course of Performance

HYC contends it worked for OJCommerce after Weiss signed the Contract.  Usually, says HYC, OJCommerce notified it when international shipping containers were en route to the

United States.  (ECF No. 1 at PageID 8.)  This would prompt HYC to "undertake logistics for the domestic side transport process."  (*Id.*)  So before the containers arrived, "HYC would hire a domestic trucking company capable of picking up the international shipping containers and delivering them to OJCommerce's designated location . . . ."  (*Id.*)  HYC or its agent would then communicate with the port of entry to schedule a pick-up date and time and also obtain any necessary equipment for the loading and unloading process.  (*Id.* at PageID 8–9.)

Then, "the port would only release the international shipping containers to HYC or its designated trucking company."  (*Id.* at PageID 9.)  In sum, HYC allegedly managed this "process from start to finish—resolving issues when they arose—and at all times staying in contact and communication with OJCommerce, the port, and the trucking company."  (*Id.*)  HYC contends that managing the logistics for OJCommerce required it "to incur substantial expenses"— expenses that OJCommerce allegedly agreed to pay "in addition to the agreed upon fees for HYC's services."  (*Id.*)

HYC allegedly completed the process outlined above for more than 242 shipping containers at OJCommerce's direction without issue.  (*See id.*)  And after each successful delivery, HYC contends that it "promptly tendered invoices to OJCommerce for the services rendered and requested payment."  (*Id.*)  But despite receiving the benefits of HYC's services, OJCommerce allegedly never paid HYC all the money it owed under the Contract.  (*Id.*)

HYC argues this was all part of OJCommerce's plan.  OJCommerce—through Weiss— allegedly intended "to utilize HYC's services while cheating HYC out of its earned fees and reimbursable expenses."  (*Id*. at PageID 10.)  First, when asked to pay, Defendants would give HYC some "reason" it was unable to pay while promising that it would pay HYC for its services soon.  (*Id.* at PageID 2, 10.)  HYC contends this was a deliberate, and successful, effort to induce

it to continue providing OJCommerce services.  (*Id.* at PageID 10.)  Second, and after "daily calls and emails chasing Weiss," HYC alleges that Defendants sent a partial payment of $85,000.00 in November 2022, "leaving an unpaid balance which Weiss promised would be forthcoming."  (*Id.*)  According to HYC, Defendants never intended to pay HYC more than this.  (*Id.*)  Instead, "Weiss made these fraudulent misrepresentations about payment and perpetuated this fraudulent inducement to further his own business enterprise while knowing it breached the Contract and damaged HYC."  (*Id.*)

## III.    The December Job

After Defendants' partial payment in November 2022, OJCommerce allegedly asked HYC to manage the pickup and delivery of nine international shipping containers—the December Job.  (*See id.* at PageID 10–11 (citing ECF Nos. 1-4, 1-5, 1-6).)  HYC contends it was reluctant to take on the December Job.  (*Id.* at PageID 11.)  But considering Defendants' partial payment and assurances that "all the unpaid balances and the fees owed to HYC, including the December Job, would be paid as a 'top priority[,]'" HYC accepted Defendants' request.  (*Id.*)

HYC then learned that the nine shipping containers were set to arrive at the Port of Los Angeles around December 12, 2022.  (*Id.*)  Because Defendants still had an unpaid balance, HYC contends it made a renewed request for payment from OJCommerce before arranging pickup of the nine containers that made up the December Job.  (*Id.*)  "Weiss responded that the payment could not be made at that time but assured HYC that payment to HYC was 'a top priority' and that after HYC completed the December Job, OJCommerce would immediately pay HYC's open bills in full."  (*Id.* at PageID 12.)  HYC argues that Weiss's assurances again induced it to complete the work for OJCommerce.  (*Id.*)  HYC then hired 562 Trucking to "pick-up and transport the nine . . . containers that made up the December Job."  (*Id.*)

The timing of what happens next is important.  562 Trucking—at HYC's direction—allegedly scheduled a time to retrieve the nine shipping containers for the December Job.  (*Id.*) "562 Trucking scheduled the pickup for December 13 and 14, 2022."  (*Id.*)  HYC confirmed that pickup on the morning of December 13, 2022.  (*Id.*)  That same morning, HYC also alleges that it "contacted OJCommerce to confirm that payment would be made for all of the delinquent fees and expenses associated with all the other jobs HYC had completed for OJCommerce and the December Job."  (*Id.*)  Before hearing back from Defendants, HYC allegedly dispatched 562 Trucking to complete the December Job.  (*Id.*)  "[A]t 11:59 AM," an OJCommerce employee "sent an email directing that HYC 'cancel all pick-up appointments scheduled.'"  (*Id.* at PageID 12–13 (citing ECF No. 1-7).)  "Approximately 24 minutes later, Weiss . . . sent an email directing HYC to 'cancel all open appointments and confirm so we can rebook.'"  (*Id.* at PageID 13 (citing ECF No. 1-8).)  But by that point, HYC contends it "had already undertaken substantial work on the December Job and had advanced significant costs."  (*Id.*)

562 Trucking completed the December Job by December 14, 2022.  (*Id.*)  HYC emailed OJCommerce "demanding payment in full" the next day.  (*Id.* at PageID 14 (citing ECF No. 1-9).)  HYC also contends that this email included a written notice of (1) "its intent to exercise its lien," (2) "the exact amount of money" Defendants owed under the Contract, and (3) that HYC was incurring per diem costs related to its storage and transport of OJCommerce's goods "for which OJCommerce would be held liable."  (*Id.*)  That same day, counsel for OJCommerce sent a letter to HYC and 562 Trucking "making unsubstantiated claims and threatening HYC" to gain possession of the nine shipping containers "without Defendants' payment to HYC of the money it" owed.  (*Id.* (citing ECF No. 1-10).)

The saga continues.  OJCommerce's counsel sent another letter to HYC's counsel a few days later.  (*Id.* (citing ECF No. 1-11).)  This letter threatened criminal prosecution for HYC's exercise of its lien under the Contract.  (*See id.*)  On December 28, 2022, HYC's counsel responded by outlining Defendant's debt as well as HYC's contractual right "to retain and ultimately sell the contents of the nine . . . shipping containers[,]" if Defendants did not pay what they owed.  (*Id.* at PageID 15 (citing ECF No. 1-12).)  This letter also promised that HYC would release the nine shipping containers as soon as it received Defendant's payment.  (*Id.*)  The next day, OJCommerce's counsel responded by allegedly threatening HYC's counsel with "criminal action against him and his law firm based [on] his advice to HYC that it maintain and enforce its lien rights under the Contract."  (*Id.* (citing ECF No. 1-13).)

To date, Defendants still have not paid HYC, and HYC still has control of the nine shipping containers.  (*See id.*)  HYC contends that OJCommerce owes it $307,310.00 in fees and expenses.  (*Id.* at PageID 22–23.)  It also contends that OJCommerce owes it an additional $104,355.00 in storage fees and expenses that "continue to increase daily."  (*Id.* at PageID 23.)  And HYC alleges that the Contract's Section 13 entitles it "to collect per diem interest at a rate of 5% per annum, or the highest rate allowed by law, whichever is less, plus its attorney's fees and costs incurred."  (*Id.*)

## IV.    Procedural History

HYC sued Defendants OJCommerce and Weiss here in February 2023.  HYC's verified complaint seeks a declaratory judgment confirming its right to enforce its contractual lien and sell the contents of the nine containers to pay down OJCommerce's debt owed under the Contract.  (*See id.* at PageID 16–18.)  The complaint also alleges a breach of contract claim— including a breach of the duty of good faith and fair dealing—against Defendants to recover

damages for the services HYC provided.  (*Id.* at PageID 18–23, 27.)  Finally, HYC brings an action to recover damages against Weiss, as OJCommerce's agent, for alleged fraud, misrepresentation, and fraudulent inducement.  (*Id.* at PageID 23–26.)

In response, Defendants each moved to dismiss HYC's complaint.  First, Weiss moved to dismiss the complaint under Rules 12(b)(2), 12(b)(3), 12(b)(6), and 9(b).  (ECF No. 20.)  Then, OJCommerce moved to dismiss the complaint against it under Rules 12(b)(2), 12(b)(3), 12(b)(5), 12(b)(6), and 9(b).  (ECF No. 21.)  But before this litigation, Defendants sued 562 Trucking in California.

In early January 2023, OJCommerce sued 562 Trucking in the United States District Court for the Central District of California for conversion, civil theft, and intentional interference with economic advantage.  OJCommerce argued 562 Trucking (1) picked up the same "nine shipping containers from the Port of Los Angeles" in the December Job without authorization; and (2) it "continued to hold the containers without authorization[.]"[1]  562 Trucking then moved to transfer that case to this Court, pointing to the Contract's forum selection clause.  Central District of California Judge Sherilyn Peace Garnett granted 562 Trucking's motion and ordered that case (the "Transferred Case") be transferred here.

HYC and 562 Trucking then moved to consolidate the Transferred Case with the matter here under Rule 42.  OJCommerce responded in opposition.

With this background in mind, the Court next considers Defendants' various arguments for dismissal under Rule 12, beginning with those under Rule 12(b)(2).  After addressing Defendants' Rule 12 motions, the Court considers HYC and 562 Trucking's motion to

---

[1] *See* Order Granting Defendants' Motion to Transfer & Denying as Moot Defendants' Motion to Stay Pending Transfer, *OJ Commerce, LLC v. 562 Express, Inc.*, No. 2:23-cv-02226 (W.D. Tenn. Apr. 18, 2023) [hereinafter *Transferred Case*].

consolidate under Rule 42.  In the end, the Court **DENIES** the motions to dismiss and **GRANTS** the motion to consolidate.

## <u>MOTIONS TO DISMISS UNDER RULES 12(B)(2)</u>

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to move to dismiss a complaint for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  A plaintiff has the burden of showing that the court has personal jurisdiction over a defendant.  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  And so, if a defendant properly supports its motion to dismiss, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

District courts have discretion in how they resolve a Rule 12(b)(2) motion.  *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (citing *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)).  A court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion."  *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1271–72 (6th Cir. 1998) (quoting *Serras*, 875 F.2d at 1214).  The method of evaluation, moreover, affects the plaintiff's burden.  *See Malone*, 965 F.3d at 505.

The Court here considers Defendants' 12(b)(2) motion on their written submissions alone.  As a result, HYC "need only make a prima facie showing of jurisdiction[,]" and the Court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

I.      **Standard for Finding Personal Jurisdiction**

Federal courts exercise personal jurisdiction over out-of-state defendants only when it is fair to do so under the Due Process Clause of the United States Constitution's Fourteenth Amendment.  *See, e.g.*, *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  In diversity actions such as this, "federal courts must look to the law of the forum state to determine the reach of the district court's personal jurisdiction over parties, subject to constitutional due process requirements."  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007).  And so, the Court may exercise personal jurisdiction over Defendants here only if Tennessee's long-arm statutes allows it and if it complies with federal due process requirements.

Courts have consistently held that Tennessee's long-arm statutes reach to federal constitutional limits.  *See, e.g.*, *Payne v. Motorists' Mut. Ins. Cos.*, 4 F.3d 452, 455 (6th Cir. 1993).  And so the federal and Tennessee personal jurisdiction analysis merge into one federal due process analysis.

Under the Due Process Clause, defendants must have "certain minimum contacts" with the forum State such that it is "reasonable" and "does not offend traditional notions of fair play and substantial justice" to keep the suit there.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945).  A "freely negotiated" forum selection clause that is not "unreasonable and unjust" can meet this "minimum contacts" standard.  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972); *Preferred Cap., Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2009).  This is because personal jurisdiction over a party is a "waiveable right," and contracting parties may "agree in advance to submit to the jurisdiction of a particular court" via a forum selection clause.  *Preferred Cap., Inc.*, 453 F.3d at 721 (citing *Zapata*, 407 U.S. at 10).  And so, "[a] party to a

contract may waive its right to challenge personal jurisdiction by consenting to personal jurisdiction through a forum selection clause." *Zapata*, 407 U.S. at 11.

Forum selection clauses, however, are not the only way to satisfy the "minimum contacts" standard that constitutional due process requires. This standard can also be met through "all purpose," general jurisdiction and case-specific jurisdiction. *See Malone*, 965 F.3d at 501. If a court in a state has general jurisdiction over a defendant, then a plaintiff may sue that defendant on any claim in that court, no matter the claim's connection to the state. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2001). That said, specific jurisdiction depends on a connection between the forum state and the plaintiff's underlying claim. *Id.* When a court only has specific jurisdiction over a defendant, a plaintiff's claim must "arise out of" that defendant's contacts with the forum state. *Id.*

HYC argues that OJCommerce and Weiss agreed to submit to the jurisdiction of this Court when Weiss signed the Contract. (ECF No. 22 at PageID 145; ECF No. 24 at PageID 170.) Although HYC primarily relies on this signature to argue this Court should exercise personal jurisdiction over both Defendants, it also lists Defendants' "irrefutable contacts with" Tennessee that provide an alternative basis for personal jurisdiction over OJCommerce and Weiss. (ECF No. 22 at PageID 146; ECF No. 24 at PageID 168.) Defendants argue otherwise.

In the end, the Court has personal jurisdiction over both Defendants. As to OJCommerce, Weiss—its owner, President, CEO, and registered agent—consented to the jurisdiction of this Court on its behalf when he signed the Contract. But his signature did not bind Weiss personally. Even so, HYC's claims against Weiss arise out of his purposeful contacts with a Tennessee resident such that it is reasonable for this Court to exercise personal jurisdiction over him. The Court explains how it reached this conclusion below.

II.     **Jurisdiction Based on Consent**

Whether Weiss's signature binds Defendants to the terms of the Contract depends in part on the answer to the question: in what capacity did Weiss sign the Contract?  These are questions of contract interpretation.  But first, the Court has to determine what law applies.

A.     **What Law Applies?**

The parties here did not address what law should apply to this inquiry.  But in diversity actions like this, a federal district court has "to apply the 'choice of law' rules of the state in which it sits."  *Wachovia Com. Mortg., Inc. v. Sandhya Hotels, LLC*, No. 05-2256 MA/P, 2006 WL 1579570 (W.D. Tenn. June 2, 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  So Tennessee's choice of law rules apply here.

And the Contract includes a "Governing Law" provision, designating Tennessee law. (ECF No. 1-2 at PageID 36.)  "Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy."  *Wachovia Com. Mortg., Inc.*, 2006 WL 1579579, at *2 (quoting *Wright v. Rains*, 106 S.W.3d 678, 681 (Tenn. Ct. App. 2003)).  Tennessee is the only state where HYC is domiciled, so it bears a reasonable relation to the parties' transaction.  *Cf. id.*  Besides, "the choice of Tennessee law does not violate Tennessee's public policy."  *Id.*  As a result, this Court will give effect to the choice of law provision in the Contract and apply Tennessee law here.  *Cf. Schilling Foods, LLC v. First Data Corp.*, No. 2:18-cv-02320, 2021 WL 7541510, at *5 (W.D. Tenn. Aug. 10, 2021) (applying Tennessee law under similar circumstances without conducting a sua sponte choice of law analysis and citing *GBJ Cop. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998)).

The Court next considers whether the forum selection clause alone allows the Court to exercise personal jurisdiction over each Defendant in turn.

### B.     OJCommerce

OJCommerce claims the forum selection clause in the Contract does not give the Court jurisdiction here.  Courts should generally enforce a forum selection clause, unless it is shown to be unfair or unreasonable.  *Zapata*, 407 U.S. at 10 (holding that, unless it is shown to be unfair or unreasonable, a forum selection clause is prima facie valid and enforceable); *see also Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009) ("A forum selection clause should be upheld absent a strong showing that it should be set aside.").  A forum selection clause in an agreement between two business entities engaged in an arm's length commercial transaction is presumptively valid, considering "present day commercial realities[.]"  *Preferred Cap., Inc.*, 453 F.3d at 721 (citing *Zapata*, 407 U.S. at 15).

The party opposing the application of the forum selection clause bears the burden to show why a court should not enforce the clause.  *Wong*, 589 F.3d at 828.  "Where the record is devoid of an allegation that the forum selection clause is fundamentally unfair or unreasonable, a defendant has voluntarily submitted itself to personal jurisdiction and venue."  *KFC Corp. v. Wagstaff*, 502 B.R. 484, 489 (W.D. Ky. 2013).  Tennessee law adheres to these principles.  *See First Response, Inc. v. TMC Servs., Inc.*, No. 3:13-cv-0452, 2013 WL 5434712, at *4 (M.D. Tenn. Sept. 27, 2013) (citing *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W. 2d 378, 383 (Tenn. 1983)); *see also Blackwell v. Sky High Sports Nashville Operations*, *LLC*, 523 S.W.3d 624, 630 (Tenn. Ct. App. 2017).

OJCommerce is not arguing that the forum selection clause is fundamentally unfair or unreasonable.  Instead, it argues that "the only basis for jurisdiction" over it is the Contract's

forum selection clause—a contract, it asserts, that "bears no relationship to the dispute between the parties to support personal jurisdiction" against it.  (ECF No. 21 at PageID 131.)  HYC, in response, points to the forum selection clause's language: "[B]ecause the subject forum selection clause covers disputes 'relating to' the Contract, the provision in the Contract applies to any disputes that arise from the Contract or have some 'logical or causal connection to the agreement.'"  (ECF No. 24 at PageID 169.)  HYC therefore argues that "[a]ll of the claims asserted by HYC relate to the Contract and the services provided thereunder."  (*Id.* at PageID 167.)  And because the forum provision is mandatory, according to HYC, jurisdiction is proper in this Court.

### 1.    Mandatory v. Permissive Forum Selection Clauses

The Court first considers whether the forum selection clause is mandatory or permissive.  "Mandatory forum-selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum."  *Fred Montesi's, Inc. v. Centimark Corp.*, No. 04-2957 Ma/A, 2006 WL 1174480, at *3 (W.D. Tenn. May 2, 2006).  Such clauses usually come with words like "must" and "shall."  *See Gen. Elec. Co. v. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1099 (6th Cir. 1994).  Permissive forum-selection clauses, by contrast, "authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  *Fred Montesi's, Inc.*, 2006 WL 1174480, at *3.

The forum selection clause here is mandatory.  The clause states that the parties "irrevocably consent to the jurisdiction of the United States District Court and the State courts of TN" and that "any action relating to the services performed by the Company, shall only be brought in said courts."  (ECF No. 1-2 at PageID 36.)  Considering this Contract provision under similar law, Judge Garnett held "[t]he plain language of 'any action . . . shall only be brought in

15

said courts' combined with the words 'irrevocably consent' dictates that this forum selection clause is mandatory rather than permissive."[2]  This Court agrees.

### 2.    The Forum Selection Clause's Scope

With that in mind, the Court next reviews whether HYC's claims against OJCommerce fall within the clause's scope.  "A forum selection clause confers personal jurisdiction on a court over only those disputes that the parties agreed to litigate in that forum."  *Traton News, LLC v. Traton Corp.*, 528 F. App'x 525, 528 (6th Cir. 2013).  Courts within the Sixth Circuit and elsewhere "interpret forum selection clauses with 'related to' language as covering tort . . . claims 'related to' the contract's purpose."  *Hasler Aviation, L.L.C. v. Aircenter, Inc.*, No. 1:06-cv-180, 2007 WL 2463283, at *5 (E.D. Tenn. Aug. 27, 2007) (citing *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (6th Cir. 1993) ("Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action.")).

HYC argues that the parties consented to the jurisdiction of this Court for "any action relating to the services performed" by HYC or its agents when OJCommerce—through Weiss—signed the Contract.  (*See* ECF No. 24 at PageID 166–67.)  HYC asks this Court to declare and enforce its rights under the Contract and argues that OJCommerce breached that agreement when it only partially paid HYC for its services.  (ECF No. 1 at PageID 16, 18.)  These claims therefore fall within the forum selection clause's scope because they are "predicated on" the parties alleged consent to that provision.  *Cf. Gen. Env't Sci. Corp. v. Horsfall*, Nos. 92-4110 to

---

[2] *See* Order Granting Defendants' Motion to Transfer & Denying as Moot Defendants' Motion to Stay Pending Transfer, *Transferred Case*, No. 2:23-cv-02226 (W.D. Tenn. Apr. 18, 2023).

92-4114, 1994 WL 228256, at *8 (6th Cir. May 25, 1994) (finding that a contract's forum selection clause applied to claims "predicated on" that agreement).

HYC's fraud-based allegations are no different.  HYC claims it continued to serve OJCommerce under the Contract without being paid because it relied on Defendants' fraudulent misrepresentations.  OJCommerce's duty to pay HYC for its services, if any, hinges on the Contract.  Any alleged fraudulent misrepresentations about OJCommerce's payments to HYC would therefore be related to the services HYC was contractually bound to perform.  So, like Judge Garnet already determined about OJCommerce's tort actions against 562 Trucking, HYC's "causes of action are covered by the forum selection clause."[3]  *See Gen. Env't Sci. Corp.*, 1994 WL 228256, at *8 (citing *Lambert v. Kysar*, 983 F.2d 1110, 1121–22 (1st Cir. 1993) ("The better general rule, we think, is that contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties.")).

In sum, the Court accepts HYC's claims as true, as it must at this stage, that OJCommerce—as a signatory to the Contract—has voluntarily consented to the jurisdiction of this Court under the forum selection clause.  *See Theunissen*, 935 F.2d at 1458 (explaining that courts must interpret a plaintiff's pleadings about personal jurisdiction in its favor at the motion to dismiss stage).  This is because it has not alleged, much less shown, that the forum selection clause at issue is fundamentally unfair or unreasonable.  The Court also finds that the clause is mandatory and that all HYC's claims are within its scope.  The Court therefore **DENIES** OJCommerce's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction.

---

[3] *See* Order Granting Defendants' Motion to Transfer & Denying as Moot Defendants' Motion to Stay Pending Transfer, *supra* note 2.

## C.     Weiss

Weiss argues that, even if the forum selection clause applies here, he is not bound by it individually.  (*See* ECF No. 20 at PageID 108, 105 n.1.)  This is because he only signed the Contract in his representative capacity on behalf of OJCommerce.  (*See id.* at PageID 105 n.1.)  The Court reluctantly agrees.

A corporate representative's signature on a contract does not, in general, bind him personally to that contract.  *Schilling Foods, LLC*, 2021 WL 7541510, at \*5 (citing *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382 (Tenn. 2011)).  Still, "a representative may be personally bound when the *clear* intent of the contract is to bind the representative."  *Id.* (emphasis added) (citing *84 Lumber Co.*, 356 S.W.3d at 382–83).  Although HYC argues otherwise, the Contract is unclear whether the parties intended to bind Weiss individually based on his signature alone.

HYC's argument on this point goes like this: The Contract defines it as the "Company," while defining OJCommerce as the "Customer."  The Contract later defines "Customer" as OJCommerce, "as well as its principals, agent, and/or representatives."  (ECF No. 22 at PageID 145.)  And under the forum selection clause, both the Company and Customer consented to the jurisdiction of this Court.  (*Id.*)  So this means HYC, OJCommerce, and OJCommerce's representative, Weiss, agreed that "any action relating to the services performed by [HYC] shall only be brought in . . ." Tennessee courts.  (*Id.* at PageID 145–46.)  HYC concludes that such an agreement therefore means Weiss voluntarily consented to this Court's jurisdiction here.  (*See id.*)

HYC's argument fails to address that OJCommerce's name precedes Weiss's signature.  (*See* ECF No. 1-2 at PageID 36.)  And "[a] corporate officer's signature, preceded by the corporation's name and followed by words denoting the officer's representative capacity, binds

only the corporation." *Bill Walker & Assocs., Inc. v. Parrish*, 770 S.W.2d 764, 770 (Tenn. Ct. App. 1989).  The same rule applies to officers of a limited liability company, like Weiss.  *See Creative Res. Mgmt., Inc. v. Soskin*, No. 01A01-9808-CH-00016, 1998 WL 813420, at *1 (Tenn. Ct. App. Nov. 25, 1998).

To be sure, Weiss wears many hats at OJCommerce—owner, President, CEO, manager, and registered agent.  And Weiss's signature is not "followed by words denoting [his] representative capacity[.]"  Weiss's signature, in fact, is not followed by any words.  (*See* ECF No. 1-2 at PageID 36.)  But this just adds to the ambiguity.  The Contract does not include a provision stating that, for example, Weiss "contract[s] . . . to guarantee acceptance both corporately and personally."  *Cf. Bill Walker & Assocs., Inc.*, 770 S.W.2d at 770 (finding that this language conveyed an intent to obligate the corporate officer together with the corporation).

Nor does the Contract identify Weiss by name.  *Cf. id.* (finding that an agreement's designation of a client as a corporate officer doing business as a corporation reflected the officer's intent to be bound by the contract).  In the Contract's definition of "Company" there is a space for a name, and the entity "HYC Logistics, Inc." has been filled in.  But there is no such space for a name in the Contract's definition of "Customer."  (*See* ECF No. 1-2 at PageID 33.) The Contract only identifies the Customer as "the person for which the Company is rendering service, as well as its principals, agents, and/or representatives . . . ."  (*Id.*)

In the end, the Court finds that the parties' intent is unclear whether they meant Weiss's signature on behalf of OJCommerce to bind himself also.  So at this stage, HYC cannot rely on that signature alone for this Court's jurisdiction over Weiss.

III.    **Personal Jurisdiction Based on Weiss's Contacts with Tennessee**

As discussed above, a forum selection clause is not the only way to satisfy the "minimum contacts" standard that constitutional due process requires. Contacts that provide general or specific jurisdiction will also meet the mark. *See Malone*, 965 F.3d at 501. No one contends here that the Court has general jurisdiction over Weiss. But HYC essentially argues that the Court has specific jurisdiction over him. (*See* ECF No. 22 at PageID 146.) And so, the Court will now focus on that type of jurisdiction below.

A.      **Legal Standard for Specific Jurisdiction**

Specific jurisdiction requires courts to focus on the "affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919. Different than general jurisdiction, specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). And "purposeful availment" is the phrase courts use to describe the contacts needed for specific jurisdiction. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

With these rules in mind, the Sixth Circuit applies a three-prong test to determine whether applying specific jurisdiction satisfies due process. That test is (1) whether the defendant purposefully availed itself of the benefits of conducting business or caused a consequence in the forum state; (2) whether the plaintiff's claim arose from or relates to the defendant's activities there; and (3) whether the defendant's acts or consequences caused by the defendant have a substantial connection with the forum state so that the exercise of jurisdiction over the defendant is reasonable. *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005) (citing *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Although these rules can be hard to apply in practice, the Supreme Court and the Sixth Circuit have offered some guidance. *Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914, 918 (6th Cir. 2019). "A foreign defendant's relationship with an in-forum plaintiff does not suffice 'standing alone' to confer jurisdiction." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). Nor does a "single deal with an in-forum resident . . . by itself suffice." *Id.* (citing *Walden*, 571 U.S. at 286). A "contract that bears a '*substantial* connection' to the forum," on the other hand, can "make[] the cut." *Id.* (explaining that a contract designed to exploit the forum's market or a "20-year relationship that envisioned continuing and wide-reaching contacts with [the plaintiff] in [the forum]" as contracts that could establish specific jurisdiction) (quoting *Walden*, 571 U.S. at 284–85, and *Burger King*, 471 U.S. at 479–80).

Courts also may find specific jurisdiction under the "effects" test where a foreign defendant's allegedly tortious conduct is directed at a forum state. *See, e.g.*, *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119–20 (6th Cir. 1994) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). The Supreme Court first pronounced the doctrine behind this test in *Calder*, a case in which the Court found enough minimum contacts between California and a Florida journalist based on the journalist's "intentional, and allegedly tortious, actions . . . expressly aimed at California." *Calder*, 465 U.S. at 789; *see also Walden*, 572 U.S. at 279–81 (reaffirming *Calder* but finding no personal jurisdiction where a Georgia law enforcement airport officer knew of Nevada travelers' ties to that state yet "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada"). The Sixth Circuit explained the effects doctrine like this: when a foreign defendant initiates and "purposefully directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of

the cause of action, personal jurisdiction may be present over that defendant without defendant's presence in the state." *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001).

HYC primarily relies on Weiss's signature to the Contract here to argue this Court should exercise personal jurisdiction over him. As explained above, the Court declines to do that at this stage. But HYC does list Weiss's "irrefutable contacts with" Tennessee that the Court discusses further below. (ECF No. 22 at PageID 146.) So Weiss contends that HYC "evidently relies on the 'effects test' to establish personal jurisdiction over" him. (*See* ECF No. 20 at PageID 110.) But, according to Weiss, HYC cannot satisfy this test's requirements. (*See id.*) Two cases from the Sixth Circuit demonstrate why Weiss's argument fails in the end.

### B.     *Neal* **and** *Power Investments, LLC*

First, consider *Neal v. Janssen*. 270 F.3d 328, 330 (6th Cir. 2001). That case was about a Tennessee couple who agreed with a Belgian agent to sell their out-of-state dressage horse for them. The agent called the couple many times to discuss the sale, presenting various offers made by potential buyers. But the couple discovered that the agent lied about an offer that they accepted—it turns out he underreported the amount of that offer and then kept almost $170,000 from the sale proceeds. On appeal, the Sixth Circuit held that due process permitted Tennessee to exercise personal jurisdiction over the agent in the couple's fraud case against him. *Id.* at 332–33 (relying in part on the *Calder* "effects" test).

This was because the agent intentionally aimed his fraudulent communications at Tennessee residents. And the agent's tortious contact with the forum state was not "merely incidental" but formed the "heart" of the lawsuit. *Id.* at 332. Put differently, "when a foreign defendant purposefully directs communications into the forum that cause injury within the

forum, and those communications form the 'heart' of the cause of action, personal jurisdiction

may be present over that defendant without defendant's presence in the state." *Id.*

      Next, consider *Power Investments, LLC v. SL EC, LLC*—a case in which the Sixth Circuit

relied on the holding in *Neal* to find specific jurisdiction.  927 F.3d 914 (6th Cir. 2019).  *Power*

*Investments* involved a Missouri citizen—Michael Becker—who secured financing from a

Nevada corporation—Power Investments—to buy a power plant.  *Id.* at 916.  Power Investments

had only one member—Mason Miller—who lived in Kentucky.  *Id.*  Through a series of calls,

texts, and emails to Miller seeking funds, Becker allegedly made many false statements.  *Id.*  So

Power Investments sued Becker in Kentucky for fraudulent misrepresentation and unjust

enrichment.  *Id.* at PageID 916–17.  Finding that it was constitutionally permissible for a

Kentucky court to exercise specific personal jurisdiction over Becker, the Sixth Circuit

explained:

> Becker initiated the ill-starred relationship with Miller, a Kentucky resident.  He
> communicated with him extensively for well over a year, wheedling several
> advances, gathering third-party financing, and eventually obtaining a bailout of the
> power-plant purchase.  These fraudulent communications far exceed the handful of
> phone calls at issue in Neal.  Becker called Miller's central-Kentucky cell phone
> number, as well as his landline at a Lexington law firm, "on hundreds of
> occasions."  Becker texted Miller "hundreds, if not thousands," of times.  He sent
> about 300 emails to Miller's law firm address.  And Becker's alleged
> misrepresentations in these communications constitute the core of Miller's fraud
> claims—just as in *Neal*.

*Id.* at 919 (internal citations omitted) ("This case looks more like *Calder* than *Walden*.").

## C.    Purposeful Availment Under *Neal* and *Power Investments, LLC*

      As with *Neal* and *Power Investments*, HYC has alleged enough to show that Weiss

purposefully availed himself in Tennessee.  HYC makes this showing through its verified

complaint, which the Court may consider to determine whether it has personal jurisdiction over

Weiss.  *See Theunissen*, 935 3 F.2d at 1458 ("[T]he pleadings and affidavits submitting on a

12(b)(2) motion are received in a light most favorable to the plaintiff."); *El Bey v. Roop*, 530

F.3d 407, 414 (6th Cir. 2008) (explaining that a verified complaint "carries the same weight as

would an affidavit . . .").

HYC alleges OJCommerce, via Weiss's signature, executed a service contract with

HYC—a contract with a forum selection clause designating Tennessee as the parties' forum of

choice.  (*See* ECF No. 1 at PageID 7.)  And it alleges that Weiss communicated with HYC

through calls and emails for about five months about the services OJCommerce allegedly

contracted to receive from HYC.  (*Id.* at PageID 7–16.)  According to HYC, it picked up and

transported more than 242 shipping containers for Defendants, each time at Defendants' request.

(*See id.* at PageID 9.)  HYC further contends that the parties' communication included Weiss

negotiating the Contract's payment terms via email with HYC representatives and making

allegedly false promises to pay HYC for its services.  (*See id.* at PageID 7–16.)

HYC alleges moreover that "Defendants remitted a partial payment on the fees and

expenses owed . . . leaving an unpaid balance which Weiss promised would be forthcoming."

(*Id.* at PageID 10.)  And it alleges that all the invoices it issued to OJCommerce were issued

from Tennessee, all payments owed by OJCommerce were to be sent to HYC in Tennessee, and

"all harms suffered by HYC occurred in Tennessee."  (*See* ECF No. 22 at PageID 147.)

Weiss counters that these contacts are not enough for this Court to exercise personal

jurisdiction over him.  And even if they are, he essentially argues, he made them only in his

corporate capacity.  The Court explains why it disagrees before analyzing why this case falls

somewhere between the "handful of phone calls at issue in *Neal*" and the "hundreds, if not

thousands," of texts, emails, and calls at issue in *Power Investments, LLC*.  Cf. *Power Investments, LLC*, 927 F.3d at 919.

### 1.     The Fiduciary Shield Doctrine

In his motion, Weiss seems to be arguing that the "fiduciary shield doctrine" protects him from this Court's jurisdiction.  (*See* ECF No. 20 at PageID 110.)  That doctrine provides that "when an individual defendant is an officer of a corporation, a court may not exercise personal jurisdiction over the defendant based on actions taken in his or her corporate capacity." *Sledge v. Indico Sys. Res., Inc.*, 68 F. Supp. 3d 834, 841 (W.D. Tenn. 2014) (quoting *Simplex Healthcare, Inc. v. Marketlinkx Direct, Inc.*, 761 F.Supp. 2d 726, 730–31 (M.D. Tenn. 2011)).  That said, "[a]n officer of a corporation who is 'actively and personally involved in the conduct giving rise to the claim' is subject to personal jurisdiction in the forum state because he has purposely availed himself of the forum, just as the corporation has." *Id.* (quoting *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 698 (6th Cir. 2000)).

With these rules in mind, the fiduciary shield doctrine offers Weiss no protection here. HYC alleges that Weiss is the registered agent, "President and CEO," "Manager," owner, and operator of OJCommerce.  (ECF No. 1 at PageID 4, 5.)  It also alleges that Weiss executed his fraudulent scheme "to further *his own business enterprise* while knowing it breached the Contract and damaged HYC."  (*Id.* at PageID 10 (emphasis added).)  Because Weiss is allegedly the President, CEO, owner, and operator of OJCommerce, presumably the company cannot conduct business, like paying for services under a contract, without his approval or involvement. At this stage, therefore, the Court accepts as true the factual claims that Weiss must have been "actively and personally involved in" OJCommerce's allegedly improper actions.  *See Theunissen*, 935 F.2d at 1458 (explaining that courts must interpret a plaintiff's pleadings about

personal jurisdiction in its favor at the motion to dismiss stage).  So Weiss cannot hide from this Court's jurisdiction behind the fiduciary shield doctrine.

### 2.      Initiating Services Under the Contract

The *Neal* and *Power Investments* courts found that those defendants purposefully availed themselves in the forum states at issue.  In part, this was because the foreign defendants initiated "the ill-starred" relationships with residents of those states.  True enough, HYC's complaint does not allege who launched Defendant's relationship with HYC.  But it does allege that, at the request of Defendants, HYC—a Tennessee resident—provided them logistics services for over 242 shipping containers.  Taking HYC's allegations as true, as the Court must at this stage, Defendants initiated HYC's performance under the Contract like the *Neal* and *Power Investments* defendants did with residents of foreign states.  *See Theunissen*, 935 F.2d at 1458.

### 3.      Contacts Directed at Tennessee

As mentioned above, Weiss's contacts with Tennessee fall in between the "handful of phone calls at issue in *Neal*" and the "hundreds, if not thousands," of texts, emails, and calls at issue in *Power Investments*.  *Cf. Power Investments, LLC*, 927 F.3d at 919.  True enough, the court in *Power Investments* found specific jurisdiction based in part on the defendant's calls to the forum resident's "central-Kentucky" phone numbers and emails to someone known to be in the forum state.  *See* 927 F.3d at 918–19.  And here it is unclear whether Weiss's communications included calls to HYC's western-Tennessee phone number listed at the top of the invoices it sent Defendants.  (*See* ECF No. 1-3 at PageID 38.)  It is also unclear where the recipients of Weiss's fraudulent promises and partial payment were located.

But the emails from Weiss that HYC attaches to its verified complaint show that Weiss emailed HYC representatives.  (*See* ECF No. 1-10 at PageID 65–66.)  And HYC alleges that it is

domiciled only in Tennessee.  (ECF No. 1 at PageID 4.)  This leads to the reasonable conclusion that Weiss's alleged misrepresentations and fraudulent inducements were directed at a Tennessee resident who received them in Tennessee.  *See Theunissen*, 935 F.2d at 1458.

### 4.    The "Core" of HYC's Cause of Action

Weiss's alleged dishonest communications make up the core of HYC's fraud and breach of contract claims—just as in *Neal* and *Power Investments*.  This is because Weiss's alleged partial payment, empty promises to HYC about further payment, and failure to pay HYC in full for its services under the contract "were the allegedly fraudulent communications" that "form[ed] the bases for [HYC's] tort" and breach of contract claims.  *Cf. Neal*, 270 F.3d at 332; *Power Investments, LLC*, 927 F.3d at 919 (relying on *Neal* to find that the defendant's misrepresentations constituted the "core" of the plaintiff's fraud claims).

### 5.    Weiss Purposefully Availed Himself in Tennessee

Like the out-of-state defendants in *Neal* and *Power Investments*, Weiss—in his affidavit—claims he never entered Tennessee.[4]  (*See* ECF No. 20-1.)  Yet "[t]he reality that modern business often occurs electronically and by phone will not defeat personal jurisdiction, the Supreme Court has said, if the defendant's 'efforts are purposefully directed toward residents of another State.'"  *Power Investments, LLC*, 927 F.3d at 919 (quoting *Burger King*, 471 U.S. at 476).  As discussed above, the Court finds it plausible that Weiss intentionally directed allegedly fraudulent communications toward a Tennessee resident.  At bottom, the facts here plausibly allege that Weiss purposefully availed himself of the privilege of acting in Tennessee or causing a consequence there because (1) he intentionally directed his tortious communications into

---

[4]  Weiss also contends that he has not solicited business in Tennessee and he communicated only with HYC representatives located outside of Tennessee.  All that may turn out to be true, but at this stage the Court must take HYC at its word.  *See Theunissen*, 935 F.2d at 1458.

Tennessee, (2) those communications allegedly caused an injury in Tennessee, and (3) his

communications form the "heart" of HYC's claims against him.  *See Neal*, 270 F.3d at 332–33;

*Power Investments, LLC*, 927 F.3d at 918–19.

### D. Other Due Process Elements—Arises From or Relates to and Reasonableness

The next question to resolve is whether HYC's claims "arise from" or are "related to"

Weiss's contacts with Tennessee.  *See S. Mach. Co.*, 401 F.2d at 381.  To show this, HYC must

prove that Weiss's contacts are, at minimum, related to the operative facts of the controversy.

*See MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 903 (6th Cir. 2017).  This is a "lenient

standard" in the Sixth Circuit because it requires only that HYC's claims have a "substantial

connection" to Weiss's activity in Tennessee.  *Id.*

Just as in *Neal* and *Power Investments*, Weiss's contacts with Tennessee meet this lenient

standard.  This is because HYC alleges a declaratory judgment action, a breach of contract

action, and various fraud claims against him.  And as described above, all these claims "arise[]

directly from [his] communications into [Tennessee][.]"  *See Power Investments, LLC*, 927 F.3d

at 919 (citing *Neal*, 270 F.3d at 333).

The last element under the Sixth Circuit's specific jurisdiction test is whether Weiss's

actions or the consequences allegedly caused by Weiss have enough of a connection with

Tennessee to make the Court's exercise of personal jurisdiction reasonable.  *See S. Mach. Co.*,

401 F.2d at 381.  Courts consider many factors under this element including: "(1) the burden on

the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief;

and (4) other states' interest in securing the most efficient resolution of the controversy."  *Interac

Corp.*, 428 F.3d at 618.

Two things show that the burden on Weiss here is minimal.  First, Weiss signed the Contract on behalf of his company that included a forum selection clause and a choice of law provision bringing the case here.  To this point he argues that he did not sign that agreement in his individual capacity.  Fair enough.  But "[a] choice of law provision, though alone insufficient to establish jurisdiction, can 'reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'"  *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000) (quoting *Burger King*, 471 U.S. at 482).  And "[i]t is a bedrock principle of contract law that an individual who signs a contract is presumed to have read the contract and is bound by its content."  *84 Lumber Co.*, 356 S.W.3d at 383.

Because the law presumes he read the Contract, the capacity in which Weiss signed the Contract is less important when assessing foreseeability.  Weiss signed the Contract and serves as OJCommerce's President, CEO, owner, and operator.  He knew or should have known about the agreement's choice of law provision—a provision that lists Tennessee as the forum for "any action relating to the services" HYC performed.  (*See* ECF No. 1-2 at PageID 36.)  Taking HYC's allegations about Weiss's fraudulent communications as true, this provision reinforces Weiss's deliberate link with Tennessee and that he could reasonably foresee he would need to defend his tortious conduct there.

Second, OJCommerce—at the direction of Weiss—sued 562 Trucking in a California court.  Remember, neither OJCommerce nor Weiss are domiciled in California.  Because California is farther away from Florida than Memphis, Tennessee, the Court finds that Weiss would not be substantially burdened if this Court compelled him to litigate the case here.

The remaining reasonableness factors also favor this Court exercising personal jurisdiction over Weiss.  Tennessee has an interest in protecting its residents, including HYC.

HYC also has a substantial interest in obtaining relief from a Tennessee court.  It agreed with Defendants that the parties would resolve any disputes related the services HYC provided under the Contract in Tennessee.  And HYC is domiciled only in Tennessee.  Finally, Weiss is a Florida resident.  Florida has an interest in protecting its residents.  But HYC's claims against Weiss, as discussed above, arise from his contacts with Tennessee and involve a Contract that says Tennessee will be the forum to resolve disputes.  Tennessee therefore is the forum with the strongest interest in resolving this controversy.

Just as the Sixth Circuit found in *Power Investments*, this Court finds that "[i]t is reasonable to hold [a defendant] to account in the State where his fraud occurred and from which he benefited financially."  927 F.3d at 919.  The Court therefore **DENIES** Weiss's motion to dismiss for lack of personal jurisdiction.

## MOTIONS TO DISMISS UNDER RULE 12(B)(3)

Federal Rule of Civil Procedure 12(b)(3) allows a defendant to move to dismiss a plaintiff's complaint for improper venue.  "On a 12(b)(3) motion to dismiss, 'the plaintiff bears the burden of proving that venue is proper.  The Court may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff.'" *Gone to the Beach, LLC v. Choicepoint Servs., Inc.*, 434 F. Supp. 2d 534, 536–37 (W.D. Tenn. 2006) (citation omitted).

Twenty-eight U.S.C. § 1391 governs venue issues for all federal civil actions.  It provides:

(b) Venue in general.—A civil action may be brought in—

    (1) a judicial district in which any defendant resides, if all defendants are resident of the State in which the district is located;

      (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

      (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

This Court need look no further than § 1391(b)(3) to find that venue in the Western District of Tennessee is proper. As explained above, OJCommerce voluntarily consented to this Court's jurisdiction of HYC's claims under the Contract's mandatory forum selection clause. And the Court has personal jurisdiction over Weiss because he was allegedly "actively and personally involved in the conduct giving rise to the claim." *Balance Dynamics Corp.*, 204 F.3d at 698. The Court therefore **DENIES** Defendants' motions to dismiss the complaint for improper venue (ECF Nos. 20, 21) because it has personal jurisdiction over both OJCommerce and Weiss. *See* 28 U.S.C. § 1391(b)(3).

## <u>MOTION TO DISMISS UNDER RULE 12(B)(5)</u>

Only Defendant OJCommerce moves to dismiss HYC's complaint under Rule 12(b)(5)— dismissal for insufficient service of process. (*See* ECF No. 21 at PageID 121.) OJCommerce contends that under Rule 4(h)(1)—the federal Rule on how a plaintiff may serve a corporation— HYC could perfect service on it either under Rule 4(h)(1)(B), Tennessee law, or Florida law. (*See id.*) As OJCommerce sees it, HYC met none of these standards, so the Court should dismiss HYC's claims against it under Rule 12(b)(5). (*See id.*)

In response, HYC outlines its attempts to serve Defendants despite their alleged efforts to do "everything possible to evade service." (*See* ECF No. 24 at PageID 165.) HYC details, by exhibits attached to its complaint and by affidavit, its communications with Defendants'

counsel—Shlomo Hecht—via "phone and email, prior to filing the lawsuit." (*See, e.g.*, ECF No. 1-11; *see also* ECF No. 23.) Because of this communication, HYC's counsel emailed a copy of the Verified Complaint to Mr. Hecht "asking if he would agree to accept service on behalf of his clients." (*See* ECF No. 24 at PageID 157.) But despite Mr. Hecht's earlier communication with HYC's counsel, he never responded to that email. (ECF No. 23 at PageID 153.)

HYC then retained a process server—Ramon Almonte—to serve Defendants. (*Id.*) Mr. Almonte tried to serve OJCommerce—through its registered agent Weiss—and Weiss individually at the address for the registered office three times. (ECF No. 23 at PageID 154.) Each time, a "front desk employee" allegedly told Mr. Almonte that Weiss was not in the office, that he did not have a set schedule, and that "no other manager was available" to accept service of process. (*Id.*) So HYC's counsel searched public records for Weiss's home residence. (*Id.*)

Mr. Almonte then successfully delivered a copy of the summons and complaint to Odelia Sholmay—a woman over fifteen "who identified herself as the wife and co-resident of Jacob Weiss"—at Weiss's "usual place of abode[.]" (*Id.* at PageID 155.) Mr. Almonte also apparently informed Ms. Sholmay about "the contents of the papers being handed to her[.]" (*Id.*) Defendants do not dispute that HYC properly served Weiss, individually, under Rule 4(e). (*Compare* ECF No. 20, *with* ECF No. 21.)

Under a Florida law, HYC also reissued summons to Weiss and OJCommerce for substitute service though the Florida Secretary of State. (*See* ECF No. 23 at PageID 155; ECF No. 24 at PageID 159.) The Florida Department of State allegedly accepted substitute service for both Defendants. (ECF No. 24 at PageID 159.)

With this background in mind, the Court next provides the legal standard for dismissing a complaint for failure to effect service of process under Rule 12(b)(5) before analyzing the parties' arguments here.

## I.        Standard for Dismissal Under Rule 12(b)(5)

A court may dismiss a complaint for "insufficiency of service of process" under Rule 12(b)(5). Fed. R. Civ. P. 12(b)(5). It is the plaintiff's job to have the summons and complaint timely served on a defendant—that is, effect service of process—as Rule 4 prescribes. *See* Fed. R. Civ. P. 4. "Courts may look to 'record evidence' and 'uncontroverted affidavits' in determining whether plaintiffs have met this burden." *See Spencer v. Caracal Int'l*, LLC, 516 F. Supp. 3d 755, 758 (M.D. Tenn. 2021) (quoting *Chapman v. Lawson*, 89 F. Supp. 3d 959, 971 (S.D. Ohio 2015))

Rule 4(m) gives plaintiffs ninety days to effect service of process, but that Rule also contemplates scenarios that justify enlarging that timeline:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

*See United States v. Oakland Physicians Med. Ctr., LLC*, 44 F.4th 565, 568 (6th Cir. 2022). "[A]bsent a finding of good cause, the court retains discretion as to whether or not to enlarge that timeframe." *Id.* "The determination of whether good cause has been shown is left to the sound discretion of the district court and will not be disturbed on appeal absent an abuse of discretion." *Leisure v. Ohio*, 12 F. App'x 320, 321 (6th Cir. 2001).

Even without good cause, Rule 4(m) gives courts discretion to extend a plaintiff's deadline to serve a defendant. *See Henderson v. United States*, 517 U.S. 654, 662 (1996). And

33

the Sixth Circuit instructs that district courts should consider these factors "when deciding whether to grant a discretionary extension of time in the absence of a finding of good cause":

> (1) whether an extension of time would be well beyond the timely service of process;
> (2) whether an extension of time would prejudice the defendant other than the inherent prejudice in having to defend the suit;
> (3) whether the defendant had actual notice of the lawsuit;
> (4) whether the court's refusal to extend time for service substantially prejudices the plaintiff, i.e., would the plaintiff's lawsuit be time-barred;
> (5) whether the plaintiff had made any good faith efforts to effect proper service of process or was diligent in correcting any deficiencies;
> (6) whether the plaintiff is a pro se litigant deserving of additional latitude to correct defects in service of process; and
> (7) whether any equitable factors exist that might be relevant to the unique circumstances of the case.

*Oakland Physicians Med. Ctr., LLC*, 44 F.4th at 569.

## II.    Analysis of OJCommerce's Motion Under Rule 12(b)(5)

The Court will not decide whether HYC has properly effected service on OJCommerce now.  True enough, "the requirement of proper service of process 'is not some mindless technicality."  *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991) (quoting *Del Raine v. Carlson*, 826 F.2d 698, 704 (7th Cir. 1987)).  But neither is the requirement "meant to be a game or obstacle course for plaintiffs."  *Devillez v. Dolgen Corp, LLC*, No. 3:22-cv-00557, 2023 WL 322445, at *2 (M.D. Tenn. Jan. 19, 2023) (quoting *Ace Am. Ins. Co. v. Meadowlands Dev. Ltd. P'ship*, 140 F. Supp. 3d 450, 455 (E.D. Pa. 2015)).  It seems, then, that dismissing HYC's complaint against OJCommerce for failure to effect service of process puts form over substance when HYC properly served the same complaint on Weiss—OJCommerce's registered agent for such service.  Weiss of course is a named Defendant in the same case with OJCommerce.  To question whether OJCommerce has notice of these claims puts form over substance.

Even more to the point, evading service is good cause for a court to extend a plaintiff's deadline to serve a defendant. *See Raytheon Co. v. Ahtna Support & Training Servs.*, LLC, No. 3:21-cv-239, 2021 WL 3038888, at *1 (W.D. Ky. July 19, 2021). Even if HYC has not already served OJCommerce, this rule and the factors outlined above support allowing HYC additional time to complete the task. *See id.* at *1–2. HYC's affidavits and attached exhibits outline its diligent efforts to serve OJCommerce. And OJCommerce, through Weiss, seems to be evading service of process.

This case is still in its early stages, so granting HYC an extension of time would not substantially prejudice OJCommerce. But the same cannot be said for HYC— if the Court dismissed OJCommerce for lack of service of process now, HYC would likely refile its action against OJCommerce, all the while litigating nearly identical claims against Weiss. Absent an extension, this would prejudice HYC. And Defendants' pattern of behavior suggests that HYC may continue to face similar difficulties serving OJCommerce in any future case between the parties. What is more, courts have found extensions reasonable under similar circumstances. *See id.* (granting the plaintiff a forty-five-day extension when a defendant appeared "to be evading service of process").

With all this in mind, the Court **DENIES** OJCommerce's motion to dismiss under Rule 12(b)(5) and **EXTENDS** the deadline for HYC to serve OJCommerce for a period of forty-five days from the entry of this Order.

## MOTIONS TO DISMISS UNDER RULES 12(B)(6)

Defendants also move to dismiss under Rule 12(b)(6) for failure to state a claim. Weiss moves to dismiss HYC's fraud-related claims against him in Counts III and IV for failure to state

a claim.[5]  (*See* ECF No. 20.)  And OJCommerce moves to dismiss HYC's: (1) declaratory

judgment claim in Count I; (2) breach of contract claim in Count II; (3) fraud-related claim in

Count IV; and (4) bad-faith claim in Count V.  (*See* ECF No. 21.)

Three Federal Rules guide the Court's analysis of Defendants' motions here—Rule 8,

12(b)(6), and 9(b).  According to Rule 8, a plaintiff's complaint must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In

practice, Rule 8 requires that a "complaint must contain sufficient factual matter, accepted as

true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, Rule 8 "demands more

than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*

Under Rule 12(b)(6), a court may grant a motion to dismiss a claim that fails to satisfy

Rule 8 only after reviewing the complaint in a light most favorable to the plaintiff.  *See Herhold*

*v. Green Tree Serv., LLC*, 608 F. App'x 328, 331 (6th Cir. 2015).  "A complaint should only be

dismissed if it is clear to the court that 'no relief could be granted under any set of facts that

could be proved consistent with the allegations.'"  *Id.* (quoting *Trzebuckowski v. City of*

*Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003)).

At the same time, fraud claims must satisfy Rule 9(b)'s heightened pleading standards.

According to that Rule, "[i]n alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "At minimum . . . [a party

---

[5] Weiss does not address HYC's claims in Counts I, II, V, or VI because those claims are based
on the Contract—it is Weiss's position that he was not a party to that Contract.  (See ECF No. 20
at PageID 109–10.)  But as the Court explained above, the parties' intent on this issue is unclear.
Although HYC cannot rely on that signature alone as the basis for this Court's jurisdiction over
Weiss, whether HYC can bring Counts I, II, V, or VI against Weiss individually remains to be
seen.

must] allege the time, place and contents of the misrepresentations . . . ." *William Beaumont Hosp. Sys. v. Morgan Stanley & Co., LLC*, 677 F. App'x 979, 982 (6th Cir. 2017) (internal quotations omitted).  Put differently, "[g]eneralized and conclusory allegations do not satisfy rule 9(b)."  *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (citations omitted).

The Court begins its analysis of Defendants' motion by first considering HYC's fraud claims in Counts III and IV.  After that, the Court considers HYC's remaining claims against OJCommerce in Counts I, II, and V.

## I.      Fraud

Tennessee recognizes three types of fraud claims—intentional misrepresentation, promissory fraud, and fraudulent concealment.  *See Boynton v. Headwaters, Inc.*, 564 F. App'x 803, 813 (6th Cir. 2014).  "Although all are related offenses, the elements of each differ slightly."  *Id.*  Before the Court can determine whether HYC has stated one or more of these claims, the Court must first address its description of its causes of action under Counts III and IV.

HYC describes its fraud-related action against Weiss and OJCommerce in Count III as one for "fraud and misrepresentation."  (ECF No. 1 at PageID 23.)  According to the Tennessee Supreme Court, "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action."  *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012).  But "to avoid confusion," that court instructs that the term "intentional misrepresentation" "should be used exclusively."  *Id.* at 342–43.  So this Court considers HYC's claim in Count III as one for "intentional misrepresentation."

In Count IV, HYC argues that Weiss fraudulently induced it to continue providing OJCommerce services under the Contact by making allegedly false promises about paying for those services. (*See* ECF No. 1 at PageID 25.) *Cf. Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 567 (6th Cir. 2003) (classifying a similar claim as one for promissory fraud). Accordingly, this Court also considers HYC's claim in Count IV as one for promissory fraud.

With that in mind, the Court next considers whether HYC alleged enough to make a claim for intentional misrepresentation and promissory fraud in turn.

### A.    Intentional Misrepresentation

As mentioned above, HYC's Count III alleges an intentional misrepresentation claim against OJCommerce and Weiss. And the Court must consider this claim under the heightened pleading standard in Rule 9(b). HYC has to plead these elements to state its intentional misrepresentation claim:

> (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Hodge*, 382 S.W.3d at 343; *see also Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006).

Defendants maintain that HYC's intentional misrepresentation claim lacks particularity under Rule 9(b). This is because, according to Defendants, that claim is "extremely vague and lack[s] any details, such as time, place, and the exact content of the statements made by [Defendants] that would provide [Defendants] with the particularity about what the allegations refer to." (ECF No. 20 at PageID 113; ECF No. 21 at PageID 127.) Defendants then attack

HYC's promissory fraud claim without addressing HYC's intentional misrepresentation claim. The Court explains below why HYC has pleaded the elements of its intentional misrepresentation claim with particularity.

### 1.    Analysis Under the Intentional Misrepresentation Elements

In its Verified Complaint, HYC alleges that OJCommerce—through Weiss— intentionally misrepresented its present ability and plan to pay for HYC's services under the Contract.  HYC alleges "Defendants executed a service contract with [it]" in August 2022.  (ECF No. 1 at PageID 7.)  According to HYC, after Defendants requested HYC pickup and transport its shipping containers, it would send Defendants an invoice with the amount Defendants owed via email.  (*Id.*)  In response, Defendants would refuse to pay HYC either "outright" or for "some 'reason' [that] suddenly emerge[d][,]" a reason Weiss would claim justified his nonpayment. (*Id.* at PageID 5.)  This behavior continued from August 2022 until December 2022.  (*See id.* at PageID 2.)  Despite HYC's invoices and its "daily calls and emails chasing Weiss," HYC alleges that Defendants never paid in full for its services.  (*Id.* at PageID 10.)

According to HYC, "Weiss made these fraudulent misrepresentations about payment . . . to further his own business enterprise while knowing it breached the Contract and damaged HYC." (*Id.*)  Despite this knowledge, he "persisted in his unlawful conduct . . . with reckless disregard." (*Id.*)  HYC bolsters its allegation that Defendants' misrepresentations about payment were "intentional" and "deliberate" by citing twenty-two other state and federal lawsuits seeking "to recover money resulting from Defendants' non-payment of service contracts." (*Id.* at PageID 6 nn. 3, 4.)

The Court finds that HYC has plausibly alleged that Defendants materially and intentionally misrepresented their ability and willingness to pay HYC for its services under the

Contract—an allegation that satisfies the first three elements of HYC's intentional misrepresentation claim.  First, the Court, at this stage, must accept as true that Defendants, when asked for payment by HYC, represented to HYC that there was some present reason that they could not pay for HYC's services.  Second, "[w]hether the communications constituted misrepresentations and whether they were material . . . are questions of fact that are properly left for trial."  *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, (S.D. Ohio 2004) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 446 (3d Cir. 1996)); *see also City of Morristown v. AT&T Corp.*, 206 F. Supp. 3d 1321, 1333 (E.D. Tenn. 2016) (citing *In re AEP ERISA Litig.* for the same proposition).  HYC therefore has properly alleged material misrepresentation in support of its claim in Count III.  But what about intent?

Third, HYC's allegations contain facts that assert a plausible claim of Defendants' intent to misrepresent.  HYC's allegations, accepted as true, show that Defendants repeatedly made false excuses about why they could not pay HYC, even though HYC satisfied its obligations under the Contract.  And HYC alleges that Defendants made these "deceptive" communications intentionally as part of their "plan to utilize HYC's services while cheating HYC out of its earned fees and reimbursable expenses."  HYC's allegations about Defendants' pattern of miscommunication here along with its allegation about almost two-dozen lawsuits against Defendants for similar conduct, makes it even more plausible.  HYC has therefore alleged enough to make a plausible claim that Defendants made the representations "either knowing that the representation was false or [that Defendants] did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false."  HYC therefore satisfies this element.

Fourth, HYC plausibly asserts justifiable reliance.  "Justifiable reliance 'is not blind faith' but 'a showing . . . that the representation was relied on . . . and that the reliance was reasonable under the circumstances.'"  *City of Morristown*, 206 F. Supp. 3d at 1336 (quoting *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 752 (Tenn. Ct. App. 2009)).  HYC asserts that it relied on Defendants' allegedly false reasons for nonpayment and their promises to pay when it chose to keep serving Defendants' logistics needs under the Contract.  And it has alleged facts that show its reliance may have been reasonable.

For example, HYC alleges that it was "unaware of Defendants' historical practice of non-payment and/or the litigation filed against . . . [Defendants] when it entered into . . ." the Contract.  (ECF No. 1 at PageID 6.)  And HYC alleges that eventually, "Defendants remitted a partial payment on the fees and expenses owed . . . ."  (*Id.* at PageID 10.)  While this left an unpaid balance on Defendants' account, it also provided HYC a plausible reason to believe Weiss's reasons for nonpayment.  In the end, "[t]he question of whether reliance on a representation is reasonable is one of fact."  *City of Morristown*, 206 F. Supp. 3d at 1336.  For now, HYC has met its burden to allege justifiable reliance on Defendants' alleged misrepresentations.  And so, HYC has also satisfied this element of its intentional misrepresentation claim.

Finally, HYC alleges that it has suffered over $400,000 in damages because of Defendants' misrepresentations.  (*See* ECF No. 1 at PageID 15.)  Accordingly, HYC has plausibly alleged the sixth and final element of its intentional misrepresentation claim against Defendants.

### 2.    Particularity Under Rule 9(b)

Rule 9(b)'s pleading standard governs fraud claims like intentional misrepresentation in federal court.  *See Alsbrook v. Concorde Career Colls., Inc.*, 469 F. Supp. 3d 805, 843 (W.D. Tenn. 2020).  That Rule requires that a plaintiff's complaint "state with particularity the circumstances constituting fraud or mistake.  Mistake, intent, knowledge, and conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); *see also Alsbrook*, 469 F. Supp. 3d at 843.  "To plead a misrepresentation with particularity, a plaintiff 'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Alsbrook*, 469 F. Supp. 3d at 843 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

The Court finds that HYC also pleads its intentional misrepresentation claim with particularity.  *Cf. Alsbrook*, 469 F. Supp. 3d at 843–46; *City of Morristown*, 206 F. Supp. 3d at 1337–39.  It specifies the statements it contends were fraudulent—Defendants' fabricated reasons why it could not pay HYC when HYC demanded payment for its services.  HYC identifies the speaker—OJCommerce through Weiss.  HYC satisfies the "where" requirement by alleging that Defendants made their allegedly false excuses for nonpayment in their responses to HYC's invoices, "daily calls and emails" requesting payment.  And HYC links Defendants' misrepresentations to a particular window of time—from August 2022 to December 2022.

At minimum, an intentional misrepresentation claim must put the defendants "on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way [plaintiff's] claim of fraud."  *City of Morristown*, 206 F. Supp. 3d at 1337 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993)).  Defendants do not explain why HYC's

allegations do not give them such notice here.  Rather they contend that HYC has not specified which of the Defendants—OJCommerce or Weiss—made the misrepresentations.  (ECF No. 20 at PageID 112; ECF No. 21 at PageID 126.)

True enough, HYC refers to OJCommerce and Weiss collectively as "Defendants" throughout its Verified Complaint, attributing the alleged misrepresentations to both of them at once.  (*See generally* ECF No. 1.)  But HYC does not "indiscriminately [group] all of the individual defendants into one wrongdoing monolith."  *City of Morristown*, 206 F. Supp. 3d at 1338 (quoting *United States,* ex rel. *Branhan v. Mercy Health Sys. of Sw. Ohio*, No. 98-3127, 1999 WL 618018 (6th Cir. 1999), a case with five defendants when the court held the plaintiff did not meet Rule 9(b)'s requirements).  Instead, HYC "has identified a single type of misrepresentation"—Defendants' alleged "reasons" they could not pay HYC for its services.  *Cf. id.* at 1339 (holding the plaintiff's collective reference to two defendants as "Defendants" throughout its complaint met Rule 9(b)'s requirements for this reason).

And HYC alleges this single type of misrepresentation "in sufficient detail and has attributed that recurring misrepresentation to two specific parties."  *Id.*  And so, the Court finds that HYC's allegations achieve Rule 9(b)'s purpose "to ensure that a defendant has a 'reasonable basis' to make out a claim and respond with an informed pleading[.]"  *Id.*  "To the extent that the alleged misrepresentations are either groundless or attributable to only one of the two Defendants, that conclusion is sure to 'emerge as discovery proceeds."  *Id.*  The Court therefore **DENIES** the motion to dismiss HYC's claim for intentional misrepresentation against OJCommerce or Weiss.

B.      **Promissory Fraud**

HYC's Count IV brings a fraud claim against Weiss based on his allegedly false promise to pay HYC for its services.  "A fraud claim based on a promise of future action is sometimes called a 'promissory fraud' claim."  *Alsbrook v. Concorde Career Colls., Inc.*, 469 F. Supp. 3d 805, 843 (W.D. Tenn. 2020).  The elements of promissory fraud are:

> (1) an intentional misrepresentation with regard to a material fact; (2) the representation was made knowingly or recklessly; (3) the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) the misrepresentation relates to . . . a promise of future action without the present intention to carry out the promise.

*Id.* (quoting *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)) (internal quotation marks omitted).

In short, promissory fraud requires allegations that the party making the misrepresentation do so "without the present intent to carry it out."  *Power & Tel. Supply Co.*, 447 F.3d at 931.  Put another way, a "plaintiff must prove more than a subsequent failure to keep the promise."  *Alsbrook*, 469 F. Supp. 3d at 845 (quoting *Jack Tyler Eng'g Co. v. Colfax Corp.*, No. 10-cv-2373, 2011 WL 6372827, at *4 (W.D. Tenn. Dec. 20, 2011)).  The plaintiff "must plead facts to show that at the time the promise was made, [the defendant] had no intention to carry it out."  *Id.*

But keep in mind that under Rule 9(b) "intent . . . may be alleged generally."  Fed. R. Civ. P. 9(b).  "The concept behind this portion of Rule 9(b) is an understanding that any attempt to require specificity in pleading a condition of the human mind would be unworkable and undesirable."  *Alsbrook*, 469 F. Supp. 3d at 845 (quoting 5A Charles A. Wright et al., Federal Practice & Procedure § 1301 (4th ed. 2020)).  Still, "'pleadings regarding the conditions of a person's mind, including malice and intent, remain bound by the plausibility requirement of Rule

44

8' of the Federal Rules of Civil Procedure, as enunciated by the Supreme Court in *Twombly* and *Iqbal*." *Id.* (quoting *Mourad v. Marathon Petrol. Co.*, 654 F. App'x 792, 798 (6th Cir. 2016)).

This means a plaintiff "must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation 'plausible on its face.'" *Id.* (quoting *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Weiss argues that HYC fails to state its promissory fraud claim against him for two reasons. First, HYC does not plead that Weiss's alleged misrepresentations were forward-looking promises with no present intent to perform. (ECF No. 20 at PageID 113–14.) And second, it does not plead Weiss's alleged misrepresentations with particularity. (ECF No. 112–13.) The Court explains below why it disagrees.

### 1.    Analysis Under the Promissory Fraud Elements

HYC alleges that "[i]n response to each request for payment," Weiss would promise that OJCommerce's payment would be coming soon. (*See e.g.*, ECF No. 1 at PageID 25.) Yet from August 2022 until December 2022, Weiss only partially paid HYC, "leaving an unpaid balance which Weiss promised would be forthcoming." (*See id.*) Just like Defendants' alleged reasons for nonpayment that the Court discussed above, HYC contends that (1) Weiss "never intended to pay HYC the balance of the money it was owed[,]" and (2) that he made these alleged promises "to further his own business enterprise while knowing it breached the Contract and damaged HYC." (*See id.* at PageID 10.)

HYC also uses the December Job to highlight Weiss's allegedly fraudulent promises. (*See id.* at PageID 11–14.)  The complaint alleges that Defendants asked HYC to pick up nine shipping containers in mid-December 2022.  (*Id.* at PageID 10–11.)  Although HYC "was reluctant to take on the December Job," Defendants had recently made a payment toward their balance.  And Defendants "assured HYC that all the unpaid balances and the fees owed to HYC, including the December Job, would be paid as a 'top priority[.]'" (*Id.* at PageID 11.)  So, according to HYC, it reluctantly took on the December Job while trying to collect the rest of the balance from Defendants.  (*Id.*)

The complaint alleges that "[o]n December 6, 2022, Weiss responded that the payment could not be made at that time but assured HYC that payment to HYC was 'a top priority' and that after HYC completed the December Job, OJCommerce would immediately pay HYC's open bills in full." (*Id.* at PageID 12.)  It then asserts "[i]nduced again by [Weiss's] assurances," HYC hired 562 Trucking and made the necessary arrangements to complete the December Job.  (*Id.*) On the day 562 Trucking was set to pick up the nine shipping containers in the December Job, HYC contacted Defendants to confirm they would pay HYC for its work.  (*Id.*)  Meanwhile, HYC dispatched 562 Trucking to get the nine shipping containers.  (*Id.*)  But rather than pay, Defendants—through an OJCommerce employee and through Weiss himself—emailed HYC to "cancel" the December Job.  (*Id.* at PageID 13–14.)

Under the promissory fraud elements, the Court must decide whether HYC alleges "sufficient factual matter" that shows Weiss had the present intent not to perform his promise to pay HYC in full for its services.  *See City of Morristown*, 206 F. Supp. 3d at 1332 (quoting *Iqbal*, 556 U.S. at 678).  HYC pleads enough facts for the Court to, at least, "draw the reasonable

inference" that Weiss made forward-looking promises without present intent to perform.  Cf. *id.* at 1332–33.

HYC pleads that, when Weiss made promises about paying HYC for its services, he made them knowing those "representations were false because OJCommerce never intended to pay for the fees and expenses due under the Contract."  (ECF No. 1 at PageID 24.)  It also pleads that Weiss made these promises each time HYC requested money from Defendants from August 2022 until December 2022.  (*See id.* at PageID 10.)  But he never fulfilled his promise, making only a partial payment in November 2022.  (*Id.*)  These allegations, again combined with the allegations that HYC has discovered a more widespread pattern of identical allegedly fraudulent conduct with other parties, is enough to support a reasonable inference that Weiss did not intend to keep his promises when he made them.  *Cf. City of Morristown*, 206 F. Supp. 3d at 1333.

What is more, the Court finds that HYC has plausibly alleged the remaining elements of its promissory fraud claim.  The Court's analysis of HYC's intentional misrepresentation claim is instructive here.  First, whether Weiss's alleged false promises constituted material misrepresentations "are questions of fact that are properly left for trial."  *In re AEP ERISA Litig.*, 327 F. Supp. 2d at 812.  And like the Court found above, HYC has alleged facts that raise a plausible assertion of Weiss's intent to misrepresent.  Just as HYC plausibly alleged its justifiable reliance on Defendants' allegedly false reasons for not paying HYC for its services under the Contract, HYC has also met its burden to prove its justifiable reliance on Weiss's allegedly false promises.  Finally, HYC alleges it has suffered over $300,000 in damages because of Weiss's alleged communications.  And so, HYC has satisfied the elements of its promissory fraud claim against Weiss.  *See Alsbrook*, 469 F. Supp. 3d at 843.

### 2.      Particularity Under Rule 9(b)

As with HYC's intentional misrepresentation claim, Rule 9(b)'s pleading standards also govern its promissory fraud claim.  *See Alsbrook*, 469 F. Supp. 3d at 843.  So HYC "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.*

HYC pleads its promissory fraud claim with particularity.  It specifies the communications it alleges were fraudulent—Weiss's repeated promises to pay HYC for its services.  HYC identifies the speaker—Weiss.  HYC pleads where Weiss delivered his allegedly false promises to pay—in his responses to HYC's invoices, "daily calls," and "emails" requesting payment.  And HYC identifies when Weiss allegedly made such promises—from August 2022 to December 2022.  This includes Weiss's response on December 6, 2022, where he allegedly told HYC that "payment could not be made" then while assuring "HYC that payment to HYC was 'a top priority[.]'"

These allegations are enough to put Weiss on notice of HYC's promissory fraud claim.  *City of Morristown*, 206 F. Supp. 3d at 1339.  And so, the Court finds that HYC's allegations satisfy Rule 9(b)'s purpose "to ensure that a defendant has a 'reasonable basis' to make out a claim and respond with an informed pleading[.]"  *Id.*  The Court therefore **DENIES** Weiss's motion to dismiss HYC's promissory fraud claim in Count IV.

## II.      Breach of Contract

OJCommerce moves to dismiss the breach of contract claim because HYC's complaint "fails to identify any actual paragraph or provision of the contract that was breached."  (ECF No.

21 at PageID 129.)  In response, HYC identifies the pleadings below that it argues plausibly

allege its breach of contract claim:

> HYC has pled the existence of a written contract for services executed between the parties; payment terms for those services negotiated and agreed to between the parties; HYC's collection recourse established under the Contract for OJCommerce's breach of the Contract for non-payment; HYC's lien rights established under the Contract for OJCommerce's breach of the Contract for non-payment; that HYC invoiced OJCommerce for all work performed for OJCommerce under the Contract; and that OJCommerce did not pay.

(ECF No. 24 at PageID 173 (citations omitted).)  The Court agrees with HYC.

To assert breach of contract in Tennessee, a plaintiff must allege "the existence of a

valid and enforceable contract, a deficiency in the performance amounting to a breach, and

damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

HYC claims that OJCommerce, through its agent Weiss, requested HYC's services for over 200

shipping containers under a contract those parties executed in August 2022.  HYC alleges it

provided these services without issue.  Still, OJCommerce never paid for the services, resulting

in over $400,000 of damages to HYC.

In support of these allegations, HYC has attached to its complaint: (1) the contract

allegedly signed by Weiss; (2) an invoice HYC allegedly emailed to OJCommerce; and (3)

OJCommerce's requests for HYC's services related to the December Job.  These allegations are

therefore enough to give OJCommerce notice of a plausible breach of contract claim.  *Cf.*

*Meberg v. Goins, Rash & Cain, Inc.*, No. 2:15-cv-156, 2016 WL 11498476, at *2 (E.D. Tenn.

Mar. 1, 2016) (denying a motion to dismiss when the "plaintiff has alleged all of the necessary

elements to provide notice to the defendant of plausible breach of contract and unjust enrichment

claims").  Although HYC has arguably not identified the particular contract terms breached by

nonpayment, OJCommerce "has sufficient notice of the alleged conduct that gives rise to the claims." *Id.* And so, the Court **DENIES** OJCommerce's motion to dismiss this claim.

### III. Bad Faith: Breach of the Implied Covenant of Good Faith and Fair Dealing

HYC also brings a claim for "bad faith" against OJCommerce. (See ECF No. 1 at PageID 27.) The Court understands this claim to be one for an alleged breach of the covenant of good faith and fair dealing. (*See id.* ("Defendants owed a duty to HYC to deal fairly and act in good faith."); ECF No. 24 at PageID 175.)

The covenant of good faith and fair dealing is implied in every contract in Tennessee. *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660–61 (Tenn. 2013). But "[b]reach of the implied covenant of good faith and fair dealing is not an independent basis for relief." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 527 (6th Cir. 2003). This covenant has two purposes: (1) "it honors the contracting parties' reasonable expectations"; and (2) "it protects the rights of the parties to receive the benefits of the agreement they entered into." *Goot v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638 at *7 (Tenn. Ct. App. 2005). And whether a party to a contract has acted in good faith is a question of fact. *See Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009).

OJCommerce complains that HYC alleges this claim "without indicating what statute or common law it relies on, thereby leaving [OJCommerce] and the Court to guess what [HYC] is contending." (ECF No. 21 at PageID 134.) And OJCommerce then argues that the Court should dismiss this claim because it cannot stand on its own but must be part of an overall breach of contract claim. (*See id.*) HYC disagrees, noting it has pleaded this claim "in connection with its

causes of action for Breach of Contract and Fraud and Misrepresentation." (ECF No. 24 at PageID 174–75.)

The Court explained above that HYC has plausibly alleged the elements of its breach of contract and fraud claims against OJCommerce. Assuming these allegations are true, as the Court must at this stage, HYC also plausibly alleges that OJCommerce breached its contract by failing to act in good faith under the Contract. So HYC has plausibly alleged OJCommerce's breach of the implied covenant of good faith and fair dealing here. The Court therefore **DENIES** OJCommerce's motion to dismiss this claim.

## IV.    HYC's "Derivative Claims"—Declaratory Judgment and Damages

OJCommerce characterizes HYC's remaining counts as "derivative claims," and it argues that they, too, "fail to state valid causes of action." (ECF No. 21 at PageID 135.) In other words, according to Defendants, HYC's declaratory judgment action fails because it is based on "deficient Contract allegations," and its damages claim fails because it "regurgitate[s] the same insufficient allegations of [HYC's] breach of contract and fraud-related claims[.]" (*Id.*) Again, HYC disagrees. (ECF No. 24 at PageID 175.)

First, and as HYC notes, it may plead "multiple causes of action, even in the alternative—all arising out of the same facts[.]" (*See id.* (citing *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016).) Second, when a plaintiff seeks a declaratory judgment, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Mich. State Chamber of Com. v. Austin*, 788 F.2d 1178, 1181 (6th Cir. 1986). Third, when parties succeed on their breach of contract or fraud-related claims, they generally have a remedy in the form of monetary

damages.  *See generally Com. Painting Co. v. Weitz Co. LLC*, No. W2019-02089-COA-R3-CV,

2022 WL 737468 (Tenn. Ct. App. Mar. 11, 2022).

Again, HYC has plausibly alleged the elements of its fraud and breach of contract claims

against OJCommerce.  HYC has also plausibly alleged that there is a "substantial controversy"

between it and OJCommerce "of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."  *See Mich. State Chamber of Com.*, 788 F.2d at 1181.  And, taking as true

the damages HYC alleges in its complaint, HYC may be able to recover those amounts if it

succeeds on one or more of its claims against OJCommerce.  *See generally Com. Painting Co.*,

2022 WL 737468.  The Court therefore **DENIES** OJCommerce's motion to dismiss HYC's

declaratory judgment and damages claims.

### MOTION TO CONSOLIDATE

Finally, HYC and 562 Trucking also move to consolidate the Transferred Case with this

case under Rule 42.  (*See* ECF No. 29.)  Consolidation is appropriate when the two cases "involve a

common question of law or fact."  Fed. R. Civ. P. 42(a)(2).  Consolidation aims to "administer the court's

business with expedition and economy while providing justice to the parties."  *Wade v. Foremost Ins. Co.*

*Grand Rapids, Mich.*, No. 2:18-cv-2120, 2019 WL 13153217, at *2 (W.D. Tenn. Sept. 3, 2019) (quoting

*Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (6th Cir. 1992)).  It is the moving party's burden to

prove that the two cases meet Rule 42's requirements.  *Id.* (citing *Powell v. Oldham*, No. 2:16-cv-

2907, 2018 WL 1249909, at *2 (W.D. Tenn. Mar. 9, 2018)).

Still, whether there is a common question of law, facts, or both is a threshold inquiry—

"the decision to consolidate rests in the sound discretion of the district court."  *Powell*, 2018 WL

1249909, at *3 (citing *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993)).  Courts

should consider these factors when deciding whether to consolidate cases for trial: "(1) whether

the specific risk of prejudice and possible confusion are outweighed by the risk of inconsistent

adjudication of common factual and legal issues; (2) the burden on the parties, witnesses, and available judicial resources posed by multiple lawsuits; (3) the length of time required to conclude multiple suits as opposed to a single one; and (4) the relative expense to all parties of a single trial versus multiple trials."  *Id.* (citing *Cantrell*, 999 F.2d at 1011).

HYC and 562 Trucking argue that this case and the Transferred Case involve common questions of law and fact.  This is because "[t]he same facts and the same disputed personal property"—that is, the nine shipping containers that made up the December Job—"are common to both cases."  (ECF No. 29-1 at PageID 225.)   What is more, the Contract establishing the business relationship between HYC and Defendants also establishes the relationship between 562 Trucking, HYC, and Defendants.  (*See id.*)  So both cases, according to HYC and 562 Trucking, "will center around the same questions of law"—whether HYC had a right to enforce its lien on the contents of Defendants' shipping containers under the Contract.  (*Id.* at PageID 229.)  The Court agrees.

HYC and 562 Trucking make three more arguments for consolidation.  First, "[c]onsolidating these actions will result in a streamlined discovery process for the parties and judicial efficiency for the Court."  (*Id.*)  Second, consolidation is proper because it "will avoid the risk of inconsistent pre-trial rulings and avoid duplicative written and deposition discovery."  (*Id.*)  And third, "[n]either party will experience prejudice or an added burden due to consolidation of these matters.  Rather, consolidation will conserve money, time and resources for the parties, the witnesses, and the Court."  (*Id.*)

Defendants repeat their earlier, unsuccessful arguments in response.  These arguments are no more persuasive here.  They argue that the Court should not consolidate these cases because: (1) the Court does not have personal jurisdiction over Weiss; and (2) HYC did not serve process

on OJCommerce.[6]  As the Court explained above, the Court has personal jurisdiction over Weiss based on his contacts with Tennessee.  And the Court has given HYC additional time to serve process on OJCommerce.

But Defendants continue.  Defendants argue that these cases are at different stages in litigation and that they "would be severely prejudiced if the progress in [the Transferred Case]— already more than *six months old*—is indefinitely delayed due to the jurisdictional problems for HYC in" this case.[7]  First, these cases are at the same stage of litigation—the Court has yet to enter a scheduling order in either matter.  With one schedule, the Court can set deadlines for discovery, pretrial motions, and trial that benefits all parties involved.  Second, the Transferred Case is "already more than six months old" because Defendant sued 562 Trucking in the Central District of California, despite the Contract's forum selection clause.  But after more than three months of arguments between OJCommerce and 562 Trucking, Judge Garnett granted 562 Trucking's motion to transfer that case to this Court.  What is more, because of the common questions here, the Court chose to deal with the motion to consolidate and Defendants' motions to dismiss in one order.  Both cases will therefore be ripe for the Court's schedule after it enters this order.

Defendants also argue that because both cases are pending before this Court, there is little risk of inconsistent rulings.[8]  That may be true.  But this fails to recognize that any claim OJCommerce may have against 562 Trucking depends on whether HYC behaved appropriately under the Contract.  And so, HYC could be prejudiced if the Court did not consolidate these

---

[6] Plaintiff OJCommerce LLC's Memorandum of Law in Response to HYC Logistics, Inc. and 562 Express, Inc.'s Joint Motion for True Consolidation of Cases, *Transferred Case*, No. 2:23-cv-02226 (W.D. Tenn. May 31, 2023), ECF No. 57.
[7] *Id.*
[8] *Id.*

cases as HYC is likely a necessary party in both cases.  *See* Fed. R. Civ. P. 19 (a).  Consolidation now saves the Court and the parties time and money by avoiding that issue.

On balance, "the factors of economy, delay, expense, confusion, and prejudice weighs in favor of consolidation."  *See Powell*, 2018 WL 1249909 at *5.  The Court therefore **GRANTS** HYC and 562 Trucking's motion to consolidate.

## **CONCLUSION**

For the reasons above, the Court **DENIES** Defendants' motions to dismiss and **GRANTS** HYC and 562 Trucking's motion to consolidate.  The Court further **ORDERS** the consolidation of the Transferred Case[9] with this case.  The parties in both cases therefore should file all future documents here.  The Court respectfully **DIRECTS** the Clerk to consolidate the cases and allow 562 Trucking to file here.

**SO ORDERED**, this 31st day of July, 2023.

s/ Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

---

[9] The Transferred Case is Civil Action No. 2:23-cv-02226.