## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

HYC LOGISTICS INC,                               Case No. 2:23-cv-02050-TLP-tmp
    *Plaintiff/Counter-Defendant*

562 EXPRESS, INC.,
    *Counter-Defendant*

vs.

OJCOMMERCE, LLC,
    *Defendant/Counter-Plaintiff*

    and

JACOB WEISS,
    *Defendant.*

---

OJ COMMERCE, LLC,                                Case No. 2:23-cv-02226-TLP-atc
    *Plaintiff*
vs.

562 EXPRESS, INC.,
    *Defendant.*

---

## DEFENDANT OJ COMMERCE, LLC'S CONSOLIDATED RULE 50(b) MOTION OR, IN THE ALTERNATIVE, MOTION FOR REMITTITUR ON HYC LOGISTICS INC.'S BREACH OF CONTRACT AND LIEN CLAIMS

OJ Commerce, LLC ("OJC"), by and through undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law or, in the alternative, for remittitur pursuant to Rule 59(e). The jury, through its verdict, unequivocally found that HYC Logistics Inc. ("HYC") committed fraud and deception under the Tennessee Consumer Protection Act ("TCPA"), awarding OJC its full claimed damages. Yet, at the same

time, the jury found that OJC breached the parties' contract and awarded HYC damages—minus $49,215 in fraudulently-billed per diem fees. However, because HYC's billing fraud left it with unclean hands, the Court must grant judgment as a matter of law to OJC.

At minimum, the jury's express finding that HYC billed OJC $49,215 in fraudulent per diem charges invalidates HYC's lien notice and bars any contractual recovery. If the Court declines to enter judgment outright, the only equitable recourse is to remit HYC's damages to $0. Tennessee law and equity principles prohibit a party from profiting under a contract that it has tainted with fraud. Accordingly, OJC is entitled to judgment as a matter of law on HYC's breach of contract and lien claims.

## RELEVANT BACKGROUND

In its Answer and Affirmative Defenses to Plaintiff's Complaint, OJC specifically pleaded, "[HYC's] claims are barred in whole or in part because of unclean hands because of [HYC's] overcharging OJC, refusing to cancel future pick-up appointments even after OJC instructed [HYC] to do so, and/or stealing OJC's containers." (ECF 49, Affirmative Defenses ¶ 3, PageID 325.) Additionally, Plaintiff pleaded, "[HYC's] claims are barred in whole or in part by [HYC's] fraud because of Plaintiff's overcharging OJC, refusing to cancel future pick-up appointments even after OJC instructed [HYC] to do so, and/or stealing OJC's containers." (*Id.* at Affirmative Defenses ¶ 9, PageID 326.)

## Undisputed Facts at Trial

On August 15, 2022, OJC and HYC entered into a contract and later negotiated more specific terms regarding prices. HYC inserted a term into the form contract that Tennessee law would govern the relationship between the parties, and OJC agreed. (Trial Ex. 3 at ¶ 23.) The

contract provides that HYC was to act as the agent of OJC. (*Id.* at ¶ 2.)  The contract also provides

the following regarding "General Lien and Right to Sell Customer's Property":

> (a) Company shall have a continuing lien on any and all property and documents relating thereto of Customer coming into Company's actual or constructive possession, custody or control or enroute, which lien shall survive delivery, for all charges, expenses or advances owed to Company with regard to the shipment on which the lien is claimed, a prior shipment(s) and/or both. Customs duties, transportation charges, and **related payments advanced by the Company shall be deemed paid in trust on behalf of the Customer and treated as pass through payments made on behalf of the Customer** for which the Company is acting as a mere conduit.
>
> (b) Company shall provide **written notice** to Customer of its intent to exercise such lien, **the exact amount of monies due and owing**, as well as any on-going storage or other charges; Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.
>
> (c) Unless, within thirty days of receiving notice of lien, Customer posts cash or letter of credit at sight, or, if the amount due is in dispute, an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell such shipment(s) at public or private sale or auction and any net proceeds remaining thereafter shall be refunded to Customer.

(Trial Ex. 3 at ¶ 14 (emphasis added).)  The parties then agreed to specific rates for two different

warehouses.  (Trial Exs. 4 & 5.)    Importantly, as a part of the negotiation of the specific rates,

Itamar Aranov, an HYC employee and the point person with OJC, stated that HYC was "billing

[accessorial fees] at cost we don't make any money on the accessorial charges…." (Trial Ex. 5.)

The relationship between OJC and HYC ultimately broke down for reasons that were

disputed and discussed in detail below.  It was undisputed, however, that, on December 13, 2022,

Jacob Weiss, the President of OJC, messaged Uri Silver, the President of HYC, at 4:11 p.m. in

Israel, which is 6:11 a.m. in California, that OJC and HYC would need to "move on" and that it

didn't "make[] sense to for [OJC and HYC] to continue."  (Trial Ex. 33.)  Both Uri Silver and

Jacob Weiss testified at trial that they understood that these messages meant that HYC and OJC

3

would no longer be working together.  Following this exchange between Silver and Weiss, OJC

then sent a series of emails to HYC to formally end the agency relationship between OJC and

HYC.  Michael Jackson, an OJC employee, sent the first email:

> Hi HYC Team,
>
> We would like to request you to kindly cancel all pick-up appointments scheduled
> and kindly confirmed the same within an hour.  Please also halt any further
> scheduling of appointments. OJC will pay for return of the picked empty containers
> that are currently being handled by HYC.

(Trial Ex. 18, Email sent on December 13, 2022 by Michael Jackson.)  Then, Jacob Weiss sent a

follow up email when HYC did not respond:

> Below 10 containers show on your sheet as some having appointments and LFD
> within the next 3 days. Please cancel all open appointments and confirm so we can
> rebook.   [Listing ten containers that included the nine containers that were
> ultimately taken by HYC through 562]

(*Id.*, Email Sent by Jacob Weiss at 12:23 p.m. on December 13, 2022.)  Weiss then followed up

again when no response came from HYC:

> @HYC Team,
>
> it appears my access to the Google doc with all information about OJC Containers
> has been removed.
>
> Please advise on our request to cancel ALL pending appointments so we can secure
> our own. This request has now been pending for 1.5 hours with NO RESPONSE.
> Further delay may result in OJC incurring unexpected fees at the terminal, as
> appointments might not be available.
>
> Please be on notice that any fees occurring as a result, will fully be the responsibility
> of HYC.
>
> Thanks,
> Jacob Weiss

4

(Trial Ex. 18, Email at 1:32 p.m. on December 13, 2022.)  HYC still did not respond and instead

cut off OJC's access to the shared google sheet with information regarding the containers, so Weiss

sent another follow up email:

> Its now been 4 hours and we haven't received a response to our request, and the
> Google sheet has not been updated regarding the containers listed below. Again, I
> am asking for a quick update on cancelling all the appointments, so we can secure
> our own and avoid any additional fees, delaying the response will most likely result
> in fees that we would need to collect from HYC.
>
> Jacob

(Trial Ex. 18, Email at 4:00 p.m. on December 13, 2022.)  Finally, still having received no response

from HYC, Weiss sent the following email:

> Dear HYC Team.
>
> You are hereby advised not to pick up any containers from OJCommerce at any
> port or terminal. Any authority previously given for such pickups, is hereby
> revoked. In addition, failure by HYC to cancel immediately any pending
> appointments may result in delays, additional demurrage charges, and/or other fees,
> for which you will be held fully responsible.
>
> Govern yourself accordingly,
>
> Jacob Weiss

(Trial Ex. 18, Email at 5:53 p.m. on December 13, 2022.)

During the trial, Itamar Aranov and Uri Silver testified that they received these emails and

intentionally ignored them.  Silver testified that he specifically told Aranov not to respond.  Silver

acknowledged that, after receiving these emails, HYC then had 562 Express go to the port and

pick up the nine containers belonging to OJC.  (*See also* Trial Ex. 34.)  In doing so, HYC and 562

Express failed to disclose to the port that OJC had revoked their authority to pick up OJC's

containers when the nine containers were picked up.

*After* receiving the termination emails and then seizing the nine containers, on December 15, 2022, HYC sent its notice of intent to exercise a lien on the nine containers to OJC claiming that it was owed $307,310.00.  (Trial Ex. 46.)

This $307,310 included $49,215 for per diems.  (*See* Trial Ex. 8(b) for the full set of per diem invoices.)  At trial, the evidence showed that these per diems were never paid, were waived, and, thus, should not have been included in the lien amount.  Nonetheless, in its demand for payment to OJC, HYC included the full per diem amounts.  Aaron Hernandez, the President of 562 Express, testified by deposition that almost all the per diems were waived and were never paid.  Uri Silver admitted that he had no proof that any of them were ever paid, and HYC and 562 Express failed to offer any proof that any per diems were ever invoiced to 562 Express or HYC.  Silver testified reluctantly based on his deposition that per diems never should have been invoiced to OJC if they were not actually paid, and he admitted that a per diem that was waived should not have been charged to OJC.  Yet, approximately $49,215 was charged for per diems that were never paid and that had largely been waived.  (*See* Trial Ex. 8(b) for the full set of per diem invoices.)

The waiver of the per diems was not a surprise to HYC and 562 Express, and HYC knew that these per diems were never going to be paid.  Emails between Aronov, Silver, and Hernandez showed that Hernandez had a photoshopping system to get all the per diems waived.  (Trial Ex. 15.)  Meanwhile, HYC knew that at least five of the per diems had been waived at the time that HYC invoiced them to OJC.  (Trial Exs. 26-29; Trial Ex. 30.)   Additionally, there were approximately 20 other per diems where HYC knew that a waiver had been sought and no payment had been made.  (Trial Ex. 30.)  Yet, HYC sent invoices for those per diems to OJC in spite of this fact.  (Trial Ex. 30.)  Meanwhile, Uri Silver in both the Verified Complaint and his Declaration, which was made *after* every single per diem had been waived, continued to claim under oath that

HYC was owed the $49,215.00 for per diems that admittedly never should have been charged in the first place.  (*See* Trial Ex. 31 and 32.[1])

As Silver admitted, the undisputed evidence also showed that HYC improperly billed OJC for "US Trucking" charges that were for the wrong amount and on containers for which OJC had already been billed for the trucking charge.  (Trial Ex. 8.)

The undisputed evidence showed that the nine containers contained goods that were purchased for $701,508.81 and would have been sold for a profit of $238,279.54.  (Trial Ex. 38.)

**Disputed Arguments by OJC at Trial**

At trial, in addition to the undisputed proof regarding the per diems and the improper "US Trucking" charges, OJC also offered testimony that the congestion fees and bobtails should never have been charged to OJC.  In the case of congestion fees, Aranov testified that this was an accessorial charge, which HYC agreed would be billed at cost, yet HYC never showed any proof that any congestion fees were ever charged to HYC or 562 Express.  (*Compare* Trial Ex. 8 (HYC invoices to OJC), *with* Trial Ex. 25 (562 Express Invoices to HYC.)  Despite the fact that HYC incurred no cost for congestion fees, HYC passed on a congestion fee charge on every single container that was invoiced to OJC.  (Trial Ex. 8 (showing that the only invoices that do not include a congestion fee were the invoices for per diems).)  Congestion fees totaled more than $32,000 of the $307,310 that HYC claimed was owed by OJC.  (Trial Ex. 45.)

On the bobtail fees, the email evidence showed that, throughout the relationship, bobtails were supposed to be approved by OJC and Weiss before they were incurred.  (Trial Exs. 12, 13, 14, & 24.)  While Silver and Aronov tried to argue that bobtails did not need to be approved at first, Aronov forwarded an August 2022 email to Silver in January 2023 where he noted that the

---

1.     While these Exhibits were admitted for ID purposes only, they confirm the testimony that was given by Silver on the stand.

bobtails had not actually been approved by Weiss. (Trial Ex. 24.) Weiss testified that OJC never approved a bobtail, and HYC offered no evidence that any bobtails were ever actually approved. The bobtails that were invoiced to OJC totaled approximately $29,000.

At one point during the relationship, HYC, through Aronov and Silver, attempted to change the definition of a bobtail and double-charge OJC. Despite Aronov and Silver's sworn testimony on the stand about the definition of a bobtail, Aronov ultimately admitted that HYC tried to change the meaning of bobtail. An email exchange among Silver, Aronov, and Weiss showed this blatant attempt by HYC to unilaterally change the definition of a bobtail to its sole benefit so that it could charge OJC more improper fees. (Trial Ex. 13.)

The testimony and evidence showed that, throughout the relationship, OJC raised concerns about these extra charges and never received answers from HYC. Weiss, Aronov, and Silver all agreed that OJC and Weiss raised concerns about the accessorial fees that were being invoiced. The email exchanges between HYC and OJC showed as much. (*See, e.g.*, Trial Exs. 12, 13, 14, 16, 24, 40, and 41.) Aronov and Silver claimed that HYC provided the necessary information to OJC, yet HYC offered no evidence that the information was actually provided. Weiss testified that HYC refused to provide the requested information regarding bobtails, congestion fees, and per diems until multiple motions to compel were filed during the pendency of this lawsuit.

## Disputed Arguments by HYC at Trial

HYC generally argued that OJC owed money to HYC for the services that were provided and that OJC had only made a one-time payment of approximately $85,000. At the beginning of trial, HYC argued that the amount owed was $307,310 plus storage fees for the nine containers plus 5% interest. In the middle of trial, Silver agreed that the $307,310 should be reduced because

some of the per diems were ultimately waived, but HYC continued to claim that significant amounts were still due for per diem charges that HYC invoiced to OJC.

HYC argued that it sent invoices on the date that appeared on the invoices; however, OJC contested this and offered email evidence that the invoices were sent in large batches at a later date than what appeared on the invoices.  (Trial Exs. 10 and 43.)  Meanwhile, Eli Schecter, an HYC accounting employee, sent an email in late October of 2022 which acknowledged that OJC only owed approximately $58,000.  (Trial Ex. 11.)  On November 2, 2022, OJC made an $85,000 payment to OJC, but HYC argued that it did not receive the payment until November 15, 2022.[2] (Trial Ex. 42 (showing that payment was made on November 2, 2022.)

Even though HYC acknowledged that it had received the emails from OJC terminating the agency relationship, HYC argued that it had constructive possession of the containers before then and thus had a right to seize the nine containers after those emails.

**The Jury Verdict**

The jury found that HYC engaged in an unfair or deceptive act or practice under the Tennessee Consumer Protection Act when it failed to disclose that OJC had terminated its agency relationship when HYC had 562 Express seize the nine containers from the port.  (Verdict, ECF 302.)  The jury awarded $701,508.81 in damages to OJC for this claim.  (Verdict, ECF 302.)  This was the cost of the goods in the nine containers.  (Trial Ex. 38.)  The jury also found that HYC committed intentional and/or reckless misrepresentation and awarded $238,279.45 for this claim. (Verdict, ECF 302.)  This was the amount of profit that would have been gained if the contents of the nine containers could have been sold by OJC.  (Trial Ex. 38.)

---

2.    Notably, following this payment, on November 16 and 17, 2022, HYC sent dozens of per diem invoices to OJC for the same containers that were included in the $85,000 payment.  (Trial Ex. 8(b).)

Even though the jury found that HYC committed fraud and deception, it found that OJC committed the first material breach and awarded $587,641.04 in damages to HYC. (Verdict, ECF 302.) This amount was the amount that HYC sought for unpaid invoices, storage fees, and interest minus the full $49,215.00 for per diems. (*Compare* Trial Ex. 23 (ID only), *with* Trial Ex. 45 (showing total per diem amount).)[3] Although the jury found that fraudulent amounts had been included in HYC's invoices and its demand to OJC, the jury found that HYC properly exercised its lien right under the contract. (Verdict, ECF 302.)

## STANDARD

Within 28 days of a jury being discharged, a party may make "a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Under Rule 50(b), the Court may direct the entry of judgment as a matter of law. *Id.* "To review a motion under Rule 50(b), '[a] federal court exercising its diversity jurisdiction applies the law of the state whose substantive law governs the action to determine whether to grant or deny a motion for judgment as a matter of law based on insufficiency of the evidence.'" *EPAC Technologies, Inc. v. HarperCollins Christian Publishing, Inc.*, 810 F. App'x 389, 397 (6th Cir. 2020) (quoting *Estate of Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005)). The standard of review in Tennessee is, as follows:

> In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the nonmovant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence.

---

3.      Counsel for OJC asked counsel for HYC by email multiple times to provide the charts that he showed in closing argument so that they could be attached to this motion to show the damages calculations, but, to date, counsel for HYC has refused to provide them.

*EPAC Technologies*, 810 F. App'x at 397 (quoting *State Indus., Inc. v. Twin City Fire Ins. Co.*, F. App'x 694, 696 (6th Cir. 2005) (citing *Conaster v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995))). The United States Supreme Court has held that, where verdicts may be read consistently, "they must be resolved that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Limited*, 369 U.S. 355, 364 (1962).

Under Rule 59(e), the court has the power to alter or amend a judgment. Fed. R. Civ. P. 59(e). Although that typically occurs after a judgment is entered, here, it is appropriate to seek remittitur at this stage based on the jury's verdict. Remittitur is appropriate when an award is "beyond the range supportable by proof" or "the result of mistake." *ECIMOS, LLC v. Carrier Corporation*, 971 F.3d 616, 632 (6th Cir. 2020) (quoting *Gregory v. Shelby Cty.*, 220 F.3d 433, 443 (6th Cir. 2000)).

## LAW AND ARGUMENT

Here, the Court should find, as a matter of law, that HYC is not entitled to damages for breach of contract and did not properly exercise its lien right due to the jury's finding that HYC committed fraud and deceptive or unfair trade practices, as these clearly establish that HYC had unclean hands. The only consistent way to read the verdict in this case is that the jury found that OJC failed to timely pay for some portion of the invoices, but, then, HYC committed fraud in response by sending the per diem invoices to OJC.[4] This reading is supported by the amount that the jury removed from the damages claimed by OJC. *See supra* at 10 (citing Trial Exs. 23 and 45.) The jury then determined that HYC committed a deceptive or unfair trade practice when it

---

4. While OJC maintains that the bobtails and congestion fees were also fraudulent and that HYC breached first by including these charges in the initial batches of invoices, OJC attempts to reconcile the verdict by taking the most conservative view of the jury's verdict and the evidence to comply with the standard of review in Tennessee.

11

sent 562 Express to pick up the nine containers after the agency contract had been terminated.  As

this is the only logical way to resolve the jury's verdict in this case, it is clear that HYC has unclean

hands and should not be allowed to recover under the contract or rely on the lien right language in

the contract.  Finally, the jury's verdict demonstrates that HYC's written notice of lien, which

required HYC to identify "the exact amount of monies due and owing, was defective as a result of

the inclusion of approximately $49,215 in fraudulent charges for per diems.  Because the notice

was defective, the Court should find as a matter of law that HYC failed to properly exercise its

lien.

I.     **The Court Should Reverse the Jury's Verdict on HYC's Breach of Contract Claim
       or, Alternatively, Remit HYC's Damages to 0 Because the Jury Found that HYC
       Committed Fraud and Deceptive Practices, and Thus HYC Had Unclean Hands.**

As the jury found that HYC committed fraud and deceptive acts during the performance of

the contract at issue, HYC's hands were unclean.  Tennessee law dictates that HYC should not be

allowed to enforce the contract or seek damages in such a scenario.

A.  **HYC Was Found Liable for Fraud and Unfair and Deceptive Acts.**

Here, the jury found that HYC committed fraud and violated the Tennessee Consumer

Protection Act by committing unfair or deceptive practices. Based on the jury instructions and

applicable Tennessee law on the misrepresentation claim, the jury necessarily determined that

HYC made false representations knowingly or recklessly without knowing whether it was true or

false when HYC sent invoices to OJC.  T.P.I.- Civil 8.36.  This Court gave the pattern instruction,

and the jury ultimately found that OJC had proved by a preponderance of the evidence that HYC

made intentional or reckless misrepresentations to OJC.  (Verdict, ECF 302.)  Based on the proof

at trial and the damages awarded to HYC, it is clear that the jury removed the per diem amounts

from the award to HYC and that is what must have, at a minimum, underlay the jury's finding on the fraud claim.[5]  *See supra* at 10 (citing Trial Exs. 23 and 45).

The jury also determined that HYC violated the TCPA by committing unfair or deceptive acts.  (Verdict, ECF 302.)  In so finding, the jury found that HYC committed "unfair or deceptive" acts by causing "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." T.P.I.- Civil 11.45 (including the proper insert from Tenn. Code Ann. § 47-18-104(b)(3)).  The Court used the pattern jury instruction and included the specific allegations pleaded by OJC:  HYC acted deceptively or unfairly when it sent 562 Express to pick up the nine containers from the port but failed to disclose to the port that its agency contract with OJC had been terminated.   Looking at the evidence in the light most favorable to HYC while also trying to reconcile the jury's verdict, the jury found that HYC acted deceptively by going to the port (through its agent 562 Express) and picking up the nine containers even though OJC had sent multiple emails terminating the agency agreement and specifically informing them not to pick up the nine containers. *Supra* at 4-5 (quoting Trial Ex. 18).  Further, it was undisputed at trial that HYC received the termination emails, purposefully ignored them, and picked up the nine containers after receiving them.

Across the fraud and deception claims, the jury awarded OJC its full claimed damages of 701,508.81 for the cost of the goods in the containers plus $238,279.45 in lost profits.  (Verdict, ECF 302.)

**B.  HYC's Fraud and Deceptive Acts Made Their Hands Unclean under Tennessee Law.**

Because the jury found HYC liable for fraud and deceptive acts, HYC's hands are unclean. In Tennessee, the doctrine of unclean hands "provides the court with a basis to decline to grant

---

5.    *See supra* footnote 4.

relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims." *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007). "Any willful act regarding a litigated matter which would be condemned and pronounced as wrongful by fairminded persons is sufficient to trigger the doctrine of unclean hands." *Id.* at 417, n.26. In *Continental Bankers Life Ins. Co. of the South v. Simmons*, the Tennessee Court of Appeals reviewed a case involving fraud and examined whether the doctrine of unclean hands would bar recovery. The Court stated, as follows:

> The principle is general, and is one of the maxims of the Court, that he who comes into a Court of Equity asking its interposition in his behalf, must come with clean hands; and if it appear from the case made by him, or by his adversary, that he has himself been guilty of unconscientious, inequitable, or immoral conduct, in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of, or depends upon, or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

561 S.W.2d 460, 465 (Tenn. Ct. App. 1977). The *Simmons* Court held, "None of the parties to the fraud can have the assistance of the Court to compel . . . the enforcement . . . of the contract . . . . Equity will leave such parties where they have placed themselves, and will refuse all affirmative aid to either of the fraudulent parties." *Id.* The *Simmons* Court held that "the facts of this case" involving fraud "**require** the application of the doctrine" and reversed the lower court. *Id.* (emphasis added).

Here, the jury made a specific finding that HYC committed fraud and deceptive acts that harmed OJC, which all directly arose from the same contract and events. There can be no doubt that fraud and violations of the Tennessee Consumer Protection Act are inequitable and unconscionable acts that would be condemned as wrongful by fair-minded persons. In *Simmons*, the Tennessee Court of Appeals held that the fraud committed by the guilty parties **required** the application of the doctrine against them. Here, the same must be true.

14

**C.  Because It Has Unclean Hands, HYC Should Not Be Allowed to Recover Damages for Breach of Contract.**

Here, even viewing the evidence in the light most favorable to HYC, the Court cannot ignore the jury's finding that HYC is liable for fraud and deception.  Because the jury found that HYC committed fraud and deception, reasonable minds cannot debate that HYC had unclean hands.  Under principles of equity and fairness, the Court must enter judgment as a matter of law in favor of OJC on the breach of contract claim.  *See, e.g.*, *Simmons*, 561 S.W.2d at 465.  Alternatively, the Court should not reward HYC with damages by allowing it to benefit from a contract in light of its fraud, and the Court should instead reduce HYC's damages to $0.  Respectfully, the Court should enter judgment as a matter of law in favor of OJC on HYC's breach of contract claim or, in the alternative, remit HYC's damages.

**II.    The Court Must Also Find that HYC Failed to Properly Exercise Its Lien Right as a Matter of Law.**

Likewise, because HYC had unclean hands, it should not have been allowed to rely on the contractual language to seize the goods and assert a lien on the nine containers.  Moreover, based on the jury's verdict, the evidence is clear to all reasonable minds that the lien amount claimed was inflated by fraudulent invoices, making HYC's lien notice defective as a matter of law.

Here, because the jury found that HYC committed fraud and reduced HYC's claimed damages based on the $49,215 for the per diems, *supra* at 10, HYC's notice of lien was legally deficient.  The contract required HYC to "provide **written notice** to [OJC] of its intent to exercise such lien, **the exact amount of monies due and owing,** as well as any on-going storage or other charges."  (Trial Ex. 3 at ¶ 14(b) (emphasis added).)  As an initial matter, OJC continues to note that HYC's "written notice" did not actually provide notice because it was sent on December 15, 2022, *after* HYC had gone to the port to seize the nine containers. (Trial Ex. 46.)  For this reason

alone, the "written notice" was legally deficient, and the Court should enter judgment in favor of OJC.

Moreover, the jury's finding of fraud against HYC shows that HYC's claimed lien amount was nowhere close to "the exact amount of monies due and owing." In its December 15, 2022 written demand, HYC claimed that OJC owed HYC $307,310. (*Id.*) As discussed above, in awarding damages to HYC, the jury removed the full $49,215 for the per diem invoices to reach its number and then added the claimed storage fees and interest that HYC had requested. *Supra* at 10. As such, HYC failed to provide a proper notice under Paragraph 14(b) of the contract, and the Court must enter judgment as a matter of law in favor of OJC on the question of whether HYC properly exercised its lien. In attempting to reconcile the jury's verdict while also taking the evidence in the light most favorable to HYC, no reasonable mind could dispute that HYC did not give a proper notice with the exact amount of money due and owing. *See EPAC Technologies*, 810 F. App'x at 397. While the Court noted during prior motions that some grace must be allowed for small discrepancies due to the nature of this relationship, $49,215 is not a small discrepancy and was ultimately determined to be fraudulent by the jury.

As a matter of law, HYC should not be allowed to send a notice of lien that includes $49,215 in fraudulent charges and then have a court declare that the lien right was properly exercised. Respectfully, this Court must enter judgment as a matter of law against HYC on its lien claim.

## **CONCLUSION**

For the foregoing reasons, OJC respectfully requests that this Court enter judgment as a matter of law in favor of OJC on HYC's breach of contract and lien claims.

16

Respectfully submitted,

/s/ L. Mathew Jehl
Lawrence J. Laurenzi (TN9529)
Nathan A. Bicks (TN10903)
L. Mathew Jehl (TN38251)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN  38103
Phone:  (901) 524-5000
Fax: (901) 524-5024
Email:  LLaurenzi@bpjlaw.com
        NBicks@bpjlaw.com
        MJehl@bpjlaw.com

Aaron W. Davis
VALHALLA LEGAL, PLLC
P.O. Box 735
Custer, SD 57730-0735
Phone: 763-957-2397
Email: davis@valhallalegal.com

Shlomo Y. Hecht
Shlomo Y. Hecht, P.A.
3076 N Commerce Parkway
Miramar, FL 33025
Phone: 954-861-0025
Email: sam@hechtlawpa.com

*Attorneys for OJ Commerce, LLC
and Jacob Weiss*

## CERTIFICATE OF SERVICE

I certify that on January 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and served this document upon all counsel of record.

/s/ L. Mathew Jehl
L. Mathew Jehl

17