**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| HYC LOGISTICS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-02050-TLP-tmp |
| v. | ) | |
| | ) | JURY DEMAND |
| OJCOMMERCE, LLC, doing business as | ) | |
| OJ Commerce, LLC, and JACOB WEISS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON POST-TRIAL MOTIONS

The Court held a trial in this case in December 2024.  (ECF Nos. 289, 294–97.)  The jury returned a verdict finding that Defendant OJCommerce, LLC ("OJC") breached its contract with Plaintiff HYC Logistics, Inc. ("HYC") and that, in response to the breach, HYC properly exercised its contractual lien right.  (ECF No. 302.)  But the jury also found that HYC engaged in misrepresentation and that it deceived port authorities in Los Angeles, California, in violation of the Tennessee Consumer Protection Act ("TCPA").  (*Id.*)  Each side has pending motions here. OJC moves for judgment as a matter of law on the contract claim (ECF No. 303) and for treble damages under the TCPA (ECF No. 304).  HYC moves for judgment as a matter of law to vacate the TCPA damages award.  (ECF No. 310.)  As explained below, the Court **DENIES** OJC's motions, **GRANTS** HYC's motion, and **VACATES** the TCPA award.

## BACKGROUND

HYC provides logistics services to other companies.  OJC is a retailer who hired HYC to coordinate shipping and transportation for containers of its goods.  Relying on the trucking

company 562 Express, HYC provided the requested transportation for many of OJC's shipments, but OJC did not pay the invoices timely and instead disputed certain charges and fees.  In response to this nonpayment and under the contractual lien provision,[1] HYC had 562 Express pick up nine containers shipped to the port for OJC and hold them.

HYC then sued OJC in this Court, alleging breach of contract.  (ECF No. 1.)  And OJC counterclaimed, asserting fraud and misrepresentation and violations of the TCPA.[2]  (ECF No. 49.)  Following trial, the jury returned a verdict for HYC on the contract and lien claims.  (ECF

---

[1] Section 14 of the contract between HYC and OJC sets out HYC's remedies for nonpayment:

> (a)     Company [HYC] shall have a continuing lien on any and all property and documents relating thereto of Customer [OJC] coming into Company's actual or constructive possession, custody or control or enroute, which lien shall survive delivery, for all charges, expenses or advances owed to Company with regard to the shipment on which the lien is claimed, a prior shipment(s) and/or both. Customs duties, transportation charges, and related payments advanced by the Company shall be deemed paid in trust on behalf of the Customer and treated as pass through payments made on behalf of the Customer for which the Company is acting as a mere conduit.
> (b)     Company shall provide written notice to Customer of its intent to exercise such lien, the exact amount of monies due and owing, as well as any on-going storage or other charges; Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.
> (c)     Unless, within thirty days of receiving notice of the lien, Customer posts cash or letter of credit at site, or, if the amount due is in dispute, an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell such shipment(s) at public or private sale or auction and any net proceeds remaining thereafter shall be refunded to Customer.

(Ex. 3.)  Consistent with these provisions, HYC gave OJC written notice of (1) "its intent to exercise [its] lien," (2) "the exact amount of monies" OJC owed under the Contract, and (3) the storage and transport costs for which OJC would be liable.  (*See* Exs. 3, 46; ECF No. 302.)

[2] The Parties asserted many claims, counterclaims, and consolidated claims.  The Court dismissed some, the Parties dismissed others, and the jury did not award damages for another group of claims.  For simplicity and clarity, the Court here focuses only on the claims relevant to the pending motions.

No. 302.)  And it found for OJC on its misrepresentation and TCPA claims.  (*Id.*)

In their renewed motions for judgment as a matter of law under Federal Rule of Civil

Procedure 50(b), both Parties challenge the jury verdict.  (ECF Nos. 303, 310.)  The Court

addresses these motions now by setting out the applicable standard and then discussing the

Parties' arguments.

## LEGAL STANDARD

After trial, a party may renew its motion for judgment as a matter of law.  Fed. R. Civ. P.

50(b).  In ruling on that motion, courts may allow the original judgment on the verdict to stand,

order a new trial, or direct entry of judgment as a matter of law.  *Id.*  And "[a] court should

render judgment as a matter of law when 'a party has been fully heard on an issue and there is no

legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"

*Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (citation omitted).

In diversity actions, the test for whether there is enough evidence to support the verdict

comes from state law.  *Eastland Partners Ltd. Partners v. Village Green Mgmt. Co.*, 342 F.3d

620, 626 (6th Cir. 2003).  And in Tennessee,

> The rule for determining a motion for directed verdict requires the trial judge and
> the appellate courts to look to all of the evidence, take the strongest legitimate view
> of the evidence in favor of the opponent of the motion and allow all reasonable
> inferences from it in his favor.  The court must disregard all countervailing evidence
> and if there is then any dispute as to any material, determinative evidence or any
> doubt as to the conclusions to be drawn from the whole evidence, the motion must
> be denied.

*Newcomb v. Kohler Co.*, 222 S.W.3d 368, 390 (Tenn. Ct. App. 2006) (citations omitted).  The

court may not review the evidence de novo, weigh the evidence, or evaluate witness credibility.

*Id.* (citations omitted); *see also Schlosser*, 113 F.4th at 683 (citation omitted) (noting that the

court must "view[] the evidence in a light most favorable to the non-moving party [and] giv[e]

3

that party the benefit of all reasonable inferences," and it may not "weigh the evidence, question

the credibility of witnesses, or substitute [its] own judgment for that of the jury"). And so, a

"court may grant the motion only if, after assessing the evidence according to the foregoing

standards, it determines that reasonable minds could not differ as to the conclusions to be drawn

from the evidence." *Id.*

## ANALYSIS

I.    **Lien and Breach of Contract**

After deliberations, the jury returned a verdict finding OJC, and not HYC, "committed

the first uncured, unwaived material breach of the contract" and awarding damages to HYC in

the amount of $587,641.04. (ECF No. 302 at PageID 4245.) The jury also found that "HYC

properly exercised the lien right" in the contract.[3] (*Id.*) Defendant OJC moves for judgment as a

---

[3] Surprisingly—and contrary to its earlier position pre-trial—OJC suggested at trial and at a post-trial status conference that the validity of the contractual lien poses a question of law for the Court rather than one of fact for the jury. At minimum, OJC has waived this argument. Leading up to trial, OJC consistently asserted that a jury needed to decide the lien issue. And several times, including when requesting a last-minute continuance, OJC refused to waive that jury right. (*See* ECF No. 275 at PageID 3974–75.)

    More to the point, however, is that OJC's current argument has no merit even if it were not waived. First, contract interpretation is a question of law while breach and performance are questions of fact. *Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024) ("Interpretation of a contract and a determination of the parties' intentions related to the contract are also questions of law."); *Tenn. Homes v. Welch*, 664 S.W.3d 1, 10 (Tenn. Ct. App. 2022) ("For a breach of contract claim, we have held that whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact." (quotation marks and brackets omitted)). The Court interpreted the contract here, defined the contract's terms and the circumstances in which a lien right would arise in the jury instructions, and then turned it over to the jury to find whether the Parties performed or breached the contract terms related to the lien.

    Second, even if it were a legal question for the Court, the Court would have found, based on the evidence, that HYC properly exercised its lien. After all, Jacob Weiss testified that he owed money and refused to pay, supporting a finding of breach of contract and triggering HYC's lien right. And, as the evidence showed, the containers were en route to the port and under HYC's constructive possession, custody, or control when it exercised the lien. Lastly, the proof showed that HYC provided notice under the contract when it emailed OJC. (Ex. 46.) The Court

matter of law on the lien and contract claims, arguing that (1) unclean hands and (2) improper

notice bar recovery.  The Court addresses each of these arguments in turn.

### A.    Unclean Hands

OJC argues that "HYC's billing fraud left it with unclean hands" and that the "jury's

express finding that HYC billed OJC $49,215 in fraudulent per diem charges invalidates HYC's

lien notice and bars any contractual recovery."[4]  (ECF No. 303 at PageID 4252.)  HYC counters

OJC's position without much analysis.  (*See* ECF No. 309.)  That said, the Court finds OJC's

position untenable.

For starters, the unclean hands "doctrine applies only to parties who seek an equitable

remedy from a court."  *In re Mattie L.*, 618 S.W.3d 335, 344–45 (Tenn. 2021).[5]  But this is not

an action in equity.  It is a breach of contract case in which the Parties seek the legal remedy of

damages.  As a result, the doctrine of first breach, which prevents a party from relying on and

---

would have found, therefore, that HYC had, and correctly executed, a contractual lien over the
nine containers.

[4] HYC challenges OJC's interpretation of the jury verdict as a finding that HYC committed
fraud.  (ECF No. 309 at PageID 4311 ("Here again, as in certain of OJC's other post-trial filings,
OJC repeats its mantra that 'HYC was found liable for fraud' and/or that 'the jury found that
HYC committed fraud.'  And here again, that is patently false.  HYC was never found liable for
fraud by the jury, or by anyone else.").)  But the jury verdict, though not finding promissory
fraud, did state that HYC engaged in misrepresentation.  (*See* ECF No. 302 at PageID 4248.)
And in Tennessee, misrepresentation is fraud.  *See Hodge v. Craig*, 382 S.W.3d 325, 342–43
(Tenn. 2012) ("In fact, 'intentional misrepresentation,' 'fraudulent misrepresentation,' and
'fraud' are different names for the same cause of action.").

[5] OJC's original proposed jury instruction cites *Metric Partners Growth Suite Invs., L.P. v.
Nashville Lodging Co.*, 989 S.W.2d 700, 703 (Tenn. Ct. App. 1998), as support for applying the
unclean hands doctrine to actions at law.  (ECF No. 265 at PageID 3846.)  But that case is nearly
thirty years old and, of course, is not from the Tennessee Supreme Court.  Because this federal
Court must follow Tennessee law as the state's highest court applies it, the Court finds OJC's
position unpersuasive.  *See Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir. 2019) ("In
diversity cases, we are only bound by the forum state's highest state court. . . . When the state's
highest court hasn't addressed the issue, we must predict how it would rule by looking to all the
available data." (citations and punctuation marks omitted)).

enforcing a contract that it breached first, is more relevant here than the equitable doctrine of

unclean hands. *See Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802,

819 (Tenn. Ct. App. 2021) ("[A] party who commits the first uncured material breach of contract

may not recover damages for the other party's material breach." (citation and quotation marks

omitted)); *White v. Empire Express, Inc.*, 395 S.W.3d 696, 715 (Tenn. Ct. App. 2012) ("A party

who has materially breached a contract is not entitled to damages stemming from the other

party's later material breach of the same contract." (quoting *McClain v. Kimbrough Constr. Co.*,

806 S.W.2d 194, 199 (Tenn. Ct. App. 1990))).  Applying the doctrine of first breach also makes

sense here because OJC cannot use HYC's later misrepresentation as a defense to OJC's earlier

breach of contract.

 Moreover, even if this were an equitable action, OJC has waived the unclean hands

argument by failing to assert it at trial.  Of course, "the doctrine of unclean hands is an

affirmative defense that must be proven by the defendant . . . ." *Tenn. State Bank v. Mashek*, 616

S.W.3d 777, 813 (Tenn. Ct. App. 2020).  Although OJC asserted the unclean hands defense in its

Answer, it did not raise the issue during trial.  (*See* ECF Nos. 337–41.)  But asserting a defense

in an answer is not the same as proving it at trial.  Instead, OJC submitted an unclean hands

instruction in its proposed jury instructions.  (ECF No. 49 at PageID 325; ECF No. 265 at

PageID 3846.)    And proposing an instruction—within 70 pages of highly argumentative

proposed instructions—does not amount to an objection to the missing unclean hands instruction

in the final set.  (*See* ECF No. 299.)  *See Craddock v. FedEx Corp. Servs.*, 102 F.4th 832, 838,

842 (6th Cir. 2024) (acknowledging that merely proposing jury instructions is not the same as

objecting to them).  In fact, the Court provided a draft of the instructions it planned to give the

jury several times, and OJC never objected to the lack of the unclean hands instruction, though it

objected to and specifically offered other jury instructions.  (*See, e.g.*, ECF No. 340 at PageID 5355–405.)  As a result, OJC has waived this argument related to unclean hands.

In any case, even if the defense were not waived, OJC's theory of how unclean hands applies here is not viable.  For its argument, OJC relies on its Answer, which alleged that HYC's "claims are barred in whole or in part because of unclean hands because of [HYC's] overcharging OJC, refusing to cancel future pick-up appointments even after OJC instructed [HYC] to do so, and/or stealing OJC's containers."  (ECF No. 49 at PageID 325.)  But, as the jury found, HYC did not overcharge OJC—or, at least, not materially.  After all, if HYC materially overcharged OJC first, OJC could have rightfully refused to pay and would not have breached the contract.  And because HYC properly exercised its lien right, it neither "refus[ed] to cancel future pick-up appointments" that it had an obligation to cancel[6] nor "st[ole] OJC's containers."  (*See* ECF No. 302; *see also* Ex. 3.)

The Court therefore **DENIES** OJC's motion for judgment as a matter of law on these grounds.

**B.    Improper Lien Notice**

OJC also argues that, because the jury subtracted $49,215 from HYC's requested damage award, its "written notice of lien, which required HYC to identify 'the exact amount of monies due and owing,['] was defective."  (ECF No. 303 at PageID 4262.)  And as a result, "the Court

---

[6] Under pure agency principles, HYC might have had an obligation to terminate the later appointments.  But, by that time, HYC was no longer operating as an agent; instead, it operated as a lienholder.  As the jury necessarily found (since it decided HYC properly exercised its lien), HYC was already in possession or control of the containers and therefore had every right to pick up and retain them under its authority as a lienholder.  So HYC did not need to cancel the appointments.

should find as a matter of law that HYC failed to properly exercise its lien." (*Id.*)  The Court disagrees.

OJC reads into the verdict a finding by the jury that the amount HYC demanded in the lien notice was incorrect.  But OJC's position contradicts the verdict and the factual findings underpinning it.  For instance, whether the sum on the notice was the correct amount "due and owing" hinged on how much OJC owed at the time of the notice, when HYC provided the notice, and who breached the contract first.  And resolving those issues required the jury to weigh the evidence and assess witness credibility, which are uniquely in their province. *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 383–84 (Tenn. 2014) ("The assessment of witness credibility and resolution of evidentiary conflicts was within the sole province of the jury." (citation omitted)); *Allen v. Albea*, 476 S.W.3d 366, 381 (Tenn. Ct. App. 2015) ("The credibility of witnesses, the weight and value to be given to the evidence, and the resolution of the factual disputes presented by the evidence are within the province of the jury." (citing *id.* at 380)).  After all, the Parties aggressively disputed whether the amount in the notice was accurate and provided competing testimony on the issue.

Jacob Weiss claimed that the number was inflated with improper chassis, bobtails, per diems, and congestion fees.  He also claimed that HYC provided no notice (and not just defective notice), about HYC's intent to exercise the lien.  But HYC introduced into evidence the notice it emailed to OJC.  (Ex. 46 ("Please be advised as per attached T&C #14, HYC is hereby notifying you that if all monies owed HYC are not paid within 30 days, HYC intends to exercise our lien on your merchandise in the containers and sell them and use the proceeds to pay off outstanding balances.").)  HYC's witnesses also testified that the amount due under the contract changed daily based on storage fees and interest.  And some fees were not waived until after HYC gave

8

notice and exercised the lien, meaning the amount would have been proper at the time of notice but not recoverable in the end. Given the competing testimony and evidence on whether the notice complied with the contract's lien provision, the jury reasonably found that the amount included in HYC's notice of exercise of the lien was correct. (ECF No. 302 at PageID 4245 (the jury marking "yes" as to whether they found "by a preponderance of the evidence that HYC properly exercised the lien right").) And the Court therefore declines to find that HYC's notice was deficient as a matter of law.

For this reason, the Court **DENIES** OJC's motion for judgment as a matter of law on this issue.

## II.    TCPA

The jury awarded OJC $701,508.81 under the TCPA. The Court instructed the jury that OJC claimed that HYC violated the TCPA by "deceiving the port authorities that they were authorized agents and had permission from OJC to pick up the containers." (ECF No. 299 at PageID 4229; ECF No. 302 at PageID 4248.) HYC now moves to vacate that award by renewing its Motion for Judgment as a Matter of Law (ECF No. 310) while OJC moves for treble damages (ECF No. 304). Remember, the Court will not set aside a verdict unless, after viewing the evidence in the light most favorable to the non-moving party, it finds that the Parties were fully heard on the issue "'and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Schlosser*, 113 F.4th at 683 (citation omitted).

After setting out the law on the TCPA, the Court will address the Parties' arguments related to judgment as a matter of law. It will then discuss OJC's motion for treble damages.

9

A.        Renewed Motion for Judgment as a Matter of Law – TCPA Claim

The TCPA is designed "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Tenn. Code Ann. § 47-18-102(2).  To recover under the TCPA, "[a] plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'" *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting § 47-18-109(a)(1)).  The Parties here dispute only the first of these elements, for which the TCPA has two main provisions: (a) to prohibit "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," and (b) to list which "unfair or deceptive acts or practices affecting the conduct of any trade or commerce" violate the TCPA.  § 47-18-104(a)–(b).  Leaving aside subsection (b)(27),[7] the statute lists over 60 acts for which private parties may bring actions.  *See* § 47-18-109 (authorizing individuals to bring actions under § 47-18-104(b) of the TCPA).

A deceptive act is one that "causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact . . . ." *Tucker*, 180 S.W.3d at 116.  And a practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by

---

[7] Subsection (b)(27) makes illegal "any other act or practice which is deceptive to the consumer or to any other person; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter."  § 47-18-104(b)(27).

countervailing benefits to consumers or to competition." *Id.* at 116–17 (citing 15 U.S.C.A. §
45(n)[8]). Both unfair and deceptive practices adversely affect consumers.

HYC argues here that OJC's TCPA claim is legally lacking, and the Court should set
aside the jury's verdict on this claim. HYC claims that OJC's claim fails for many reasons: (1)
OJC is not a consumer; (2) exercising its lien right does not affect "trade," "commerce," or a
"consumer transaction" as defined in the TCPA; and (3) subsection (b)(3) does not apply under
these facts. (ECF No. 310-1 at PageID 4330–38.) HYC also argues that OJC's TCPA claim is
factually unsupported because OJC failed to prove that HYC deceived port authorities. (ECF
No. 310-1 at PageID 4338–42.)

OJC counters each of these arguments. (ECF No. 316.) OJC contends that (1) it is a
proper plaintiff under the TCPA and need not be a consumer or the party toward whom the
deceptive act was directed; (2) HYC's deceptive and unfair acts affected the conduct of trade and
commerce because the acts related to the Parties' ongoing contractual relationship; and (3)
HYC's conduct falls under Tenn. Code Ann. § 47-18-104(b)(3). (*Id.*) OJC also asserts that the
evidence offered at trial was more than enough to show that HYC violated the TCPA when it
deceived port authorities. (*Id.* at PageID 4366–67.) The Court will address each of these
arguments and, for the reasons below, finds OJC cannot rely on the statute here and that it has
failed to prove its claim.

---

[8] *Tucker* cites the description of unfairness in the Federal Trade Commission Act ("FTCA") to
"guide [its] interpretation of Tenn. Code Ann. § 47-18-104(a)." *Id.* at 117. This is because the
TCPA directs courts to "interpret[] and construe[]" Tennessee's statutes "consistently with the
interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1)
of the [FTCA], codified in 15 U.S.C. § 45(a)(1)." Tenn. Code Ann. § 47-18-115.

### 1.    Tenn. Code Ann. § 47-18-103(6): Definition of "Consumer"

HYC first argues that OJC is not a "consumer" under the TCPA.  (ECF No. 310-1 at PageID 4331.)  And OJC counters that it need not be.  (ECF No. 316 at PageID 4360–61.)  Despite the sound of it, the Parties are arguing different issues.  And both are right in part.  The Court will begin with OJC's argument.

OJC argues that business entities may bring a private right of action under the TCPA, even though the TCPA defines a consumer as a "natural person."  (ECF No. 316 at PageID 4361.)  Tenn. Code Ann. § 47-18-103(6).  This is true.  The TCPA allows "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part" to "bring an action individually to recover actual damages."  § 47-18-109(a)(1).  And it defines a "person" as a "natural person, individual, governmental agency, partnership, corporation . . . and any other legal or commercial entity however organized."  § 47-18-103(18).  That is why the Tennessee Supreme Court held in *ATS Se., Inc. v. Carrier Corp.* that "corporations have standing to bring a private cause of action for treble damages under Tenn. Code Ann. § 47-18-109(a)."  18 S.W.3d 626, 630 (Tenn. 2000).  (*See also* ECF No. 316 at PageID 4361 (quoting *id.*).)  Because OJC is a limited liability company, it is a "person" within the meaning of the TCPA, *see* § 47-18-103(18), and therefore may bring a TCPA claim, *see* § 47-18-109(a)(1).  But just because a business entity is eligible to bring an action under a statute— that is, it has statutory standing—does not also mean that all business entities have a valid claim and should *recover damages* under that statute.[9]

---

[9] Statutory standing refers to a party's ability to seek relief under a particular statute.  *See ATS Se., Inc. v. Carrier Corp.*, 18 S.W.3d 626, 627 n.3 (Tenn. 2000) ("In cases involving an alleged violation of statutory law, the question of whether a party has 'standing' to initiate a cause of

The plaintiff, whether an individual or a business entity, must also be acting as a consumer.  After all, the statute is called the Tennessee *Consumer Protection* Act.  And its stated purpose is to "*protect consumers* and *legitimate business enterprises*."[10]  § 47-18-102(2) (emphasis added).  Tennessee cases echo this goal of protecting consumers, too.  *See, e.g.*, *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 410 ("The TCPA . . . is intended to protect consumers and legitimate business enterprises . . . ." (quotation marks and citation omitted)); *Tucker*, 180 S.W.3d at 114–15 ("[O]ne of the express purposes of the TCPA is to provide additional, supplementary state law remedies to *consumers* victimized by unfair or deceptive business acts or practices . . . .").  And they repeatedly decline to extend the TCPA's protections to non-consumers, such as sellers.  *See, e.g.*, *LP Environmental, LLC v. Delfasco, LLC*, 2015 WL 13145789, at *2 ("[A]s Tennessee courts have consistently held, 'legitimate business enterprises' under section 47-18-102(2) only include those acting as consumers.").  *But see Asurion, LLC v. SquareTrade, Inc.*, 407 F. Supp. 3d 744, 751 (M.D. Tenn. 2019) (at the

---

action requires a determination of whether the statutory provision on which the claim rests grants persons in the plaintiff's position a right to seek judicial relief.").  Relying on the holding in *ATS* that corporate entities have statutory standing under the TCPA, OJC then argues that "it is irrelevant whether a corporation [or other legal entity] is a 'consumer' under the [TCPA] because the right of action is given to 'person[s],' a term that is specifically defined to include corporations [and other legal entities]."  (*See* ECF No. 316 at PageID 4361 (quoting *ATS*, 18 S.W.3d at 629).)  But this position, taken to its logical conclusion, would mean that all business entities can always sue under the TCPA.  As discussed above, that cannot be true.

[10] The TCPA does not define a "legitimate business enterprise," *see* § 47-18-103, but every Tennessee case applying the term requires the entity act in a consumer capacity, *see LP Environmental, LLC v. Delfasco, LLC*, 2015 WL 13145789, at *2 ("[A]s Tennessee courts have consistently held, 'legitimate business enterprises' under section 47-18-102(2) only include those acting as consumers.  LP cites no case where 'legitimate business enterprises' has ever been interpreted by a court to include *any* legitimate business entity in commerce and trade, not just those acting in a purchasing capacity.").  In this vein, for example, Tennessee courts do not allow sellers to bring TCPA claims against buyers who engage in deceptive practices.  *Id.*

motion to dismiss stage, allowing a competitor's TCPA claim for misleading advertising to proceed).

So OJC must also have been acting as a "consumer" to prevail on its claim. And the focus of HYC's argument is that OJC was not acting as a consumer when HYC sent 562 Express to pick up the containers. In other words, HYC does not contend that OJC, as an LLC, could never bring a claim under the TCPA. Rather, it argues that because OJC did not act as a consumer here, OJC cannot succeed on a claim under the TCPA.[11] And the Court finds that HYC's point is well-taken.

Under the TCPA, a "consumer"

seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, services, or property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated by any person who purchases or to whom is offered for sale a franchise or distributorship agreement or any similar type of business opportunity[.]

§ 47-18-103(6).[12]

OJC did not engage in any of that conduct here. To be sure, OJC was a consumer when it initially purchased logistics services from HYC. But this claim centers around

---

[11] HYC argues that, under OJC's allegations, if there is a consumer, it would be the port authorities, and 562 Express would be the party to commit the unfair or deceptive practice. (ECF No. 310-1 at PageID 4331–33.) This argument fails because HYC has repeatedly acknowledged 562 Express as its agent. (*See, e.g.*, ECF No. 337 at PageID 4700 (HYC arguing to the jury that it "br[ought] in 562 Express, a trucking company to be on call to make sure that pickups and drops offs and returns are done quickly and efficiently, just as Mr. Weiss demanded in his email."); *id.* at PageID 4733 (Aronov testifying that HYC hired 562 Express).) And, as the principal, HYC can be liable for 562 Express's conduct. *See Savage v. Cty. of Memphis*, 464 S.W.3d 326, 334 (Tenn. Ct. App. 2015) ("[W]here the principal, by his own acts or conduct, has clothed the agent with the appearance of authority to act on his behalf, he is estopped from denying liability for the acts of the agent acting within that authority.").

[12] The TCPA defines a consumer as a "natural person" but, as discussed, also applies to business entities. *See* § 47-18-109(a)(1); § 47-18-103(18); *see also* § 47-18-102(2); *ATS*, 18 S.W.3d at 629.

14

misrepresentations to the California port when HYC was exercising its lien.  As the jury found,

OJC had already breached the contract by failing to pay for services HYC had rendered, so HYC

was trying to recover past-due charges.  It was not attempting to solicit additional business.  Also

OJC was not "seek[ing] or acquir[ing]" new or additional services from HYC.  In fact, OJC

could not have been doing so because it was not involved in any of these discussions at the port.

*See id.*  (*See* ECF No. 340 at PageID 5562–63 (Weiss testifying that he could have called the

terminal to cancel the pick-up appointments).)  What is more, when 562 Express picked up the

containers in California, the proof showed that OJC and Jacob Weiss were on the opposite side of

the country trying to *end* their contractual relationship with HYC[13]—not trying to "purchase"

more "services" from it.  (Ex. 18 (email asking HYC to "cancel all open appointments").)  So

any misrepresentations HYC or 562 Express made at the California port had nothing to do with

OJC as a consumer.

      For these reasons, the Court predicts that the Tennessee Supreme Court would hold that

OJC cannot bring this TCPA claim.  *See Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir.

2019) (noting that federal courts "must predict" how a state's highest court "would rule by

looking to all the available data." (citations and punctuation marks omitted)).  Even though

business entities like OJC can challenge deceptive or unfair conduct under the TCPA, the

company must be acting in a consumer capacity.  And this Court finds that OJC was not doing so

here.

---

[13] Of course, as noted above, OJC ending the contractual relationship would not deprive HYC of its lien right.  (*See* Ex. 3 ("Company [HYC] shall have a continuing lien on any and all property and documents relating thereto of Customer [OJC] coming into Company's actual or constructive possession, custody or control or enroute, which lien shall survive delivery, for all charges, expenses or advances owed to Company with regard to the shipment on which the lien is claimed, a prior shipment(s) and/or both."); *see also* ECF No. 302 (jury finding that HYC properly exercised its lien right).)

2.    **Tenn. Code Ann. § 47-18-103(24): Definition of "Trade,"
"Commerce," and "Consumer Transaction"**

The Parties also dispute whether the alleged misrepresentation to the port "affect[s] the

conduct of any trade or commerce."  Tenn. Code Ann. § 47-18-104; *see also* § 47-18-103(24)

(defining "trade," "commerce," and "consumer transaction").  Although the TCPA is designed to

protect the "consuming public," the "parameters of the Act [] do not extend to every action of

every business in the State."  *Pursell v. First American Nat. Bank*, 937 S.W.2d 838, 841 (Tenn.

1996).  Rather, the TCPA prohibits "[u]nfair or deceptive acts or practices" that "affect[] the

conduct of any trade or commerce."  § 47-18-104(a).

"Trade," "commerce," or "consumer transaction" refer to "the advertising, offering for

sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible,

real, personal, or mixed, and other articles, commodities, or things of value wherever situated."

§ 47-18-103(24).  The TCPA defines these terms "to limit the Act's application."  *Id.*  But how

far these limitations go is unclear.  *See, e.g.*, *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d

771, 786 n.8 (Tenn. Ct. App. 2010) (declining to decide whether to "limit the protection of the

TCPA to deceptive or unfair acts in the initial luring or inducement to contract" or to apply it to

"deceptive or unfair acts perpetrated during an after-arising distribution of goods, services,

property, etc. pursuant to a contract"); *Mason v. USEC, Inc.*, No. 3:07-cv-10, 2008 U.S. Dist.

LEXIS 75714 (E.D. Tenn. Aug. 26, 2008) (explaining that "fraudulently confusing the

Department of Energy as to whether plaintiff is a risk to our national security does not affect"

trade or commerce as defined in the TCPA (internal punctuation omitted)).

For guidance on the limits of the TCPA, HYC turns to *Pursell v. First Am. Nat'l Bank*,

937 S.W.2d 838 (Tenn. 1996).  In *Pursell*, a bank loaned money to the plaintiff so he could

purchase a truck.  *Id.* at 839.  The truck was collateral for the loan, so when the plaintiff

16

defaulted, the bank hired a company to repossess the truck. *Id.* The plaintiff then sued, alleging

that the bank and repossession company engaged in allegedly unfair or deceptive practices when

they repossessed the truck. *Id.* at 839–40. The trial court dismissed the plaintiff's TCPA claim.

*Id.* at 40. And the Tennessee Supreme Court affirmed, reasoning that the defendant's "actions

following repossession of collateral for a loan" did not affect trade and commerce because they

had nothing to do with "the advertising, offering for sale, lease or rental, or distribution of any

goods, services, or property . . . ." *Id.* at 839, 841 (quoting § 47-18-103(24)). The Tennessee

Supreme Court added that, even if the defendant's actions were deceptive or unfair, the plaintiff

alleged only that the defendants breached an agreement to return the plaintiff his own property,

which did not "affect[] trade or commerce" as the TCPA defines those terms. *Id.* at 841–42.

     *Pursell* is nearly identical to the case here. Like the buyer in *Pursell* who defaulted on

his loan payments, *see id.* at 839, the jury found that OJC defaulted on its payments for HYC's

earlier services (ECF No. 302 (jury verdict finding OJC breached the contract first)). And just as

the repossession company in *Pursell* picked up the truck securing the loan, *Pursell*, 937 S.W.2d

at 839, HYC's agent 562 Express retrieved the containers over which HYC had a "continuing

lien" (Exs. 3, 46). What is more, the buyer-plaintiff in each case claimed that the other party's

conduct in recovering the property was deceptive or unfair. *Pursell*, 937 S.W.2d at 839–40.

(ECF No. 49 at PageID 341.) And so, even though the *Pursell* court limited its holding to the

facts before it and explained that the TCPA may cover some collections activities, the Court

finds *Pursell* persuasive for predicting how the Tennessee Supreme Court would handle OJC's

claims here. *See Pursell*, 937 S.W.2d at 842 ("This holding is confined to the facts and

circumstances of this case, and we do not, by this Opinion, generally exempt banking activities

from the [TCPA]."); *see also Franks v. Sykes*, 600 S.W.3d 908, 915 (Tenn. 2020) ("Thus, *Pursell* cannot be interpreted to say that no collections activities are covered by the [TCPA].").

By contrast, OJC urges the Court to rely on *Franks v. Sykes*, 600 S.W.3d 908 (Tenn. 2020), instead.  (ECF No. 316 at PageID 4364–65).  In *Franks*, the plaintiffs sustained injuries in car crashes and received treatment at the defendant hospitals.  *Franks*, 600 S.W.3d at 909–10.  The hospitals filed hospital liens against the plaintiffs for the full amount of the hospital bills without first filing claims with their health insurance companies.  *Id.* at 910.  The plaintiffs alleged that this violated § 104(b)(12) of the TCPA.[14]  *Id.*  Unlike the issue before this Court, the Tennessee Supreme Court had to decide whether consumer protection laws applied to health care providers acting in a business capacity (rather than in a medical care capacity).  *Id.* at 909, 914.  And it held that, "when a plaintiff alleges any injury caused by a health care provider's business practice—including, but not limited to, deceptive practices in advertising, billing, or collections—the plaintiff may state a claim under the Act."  *Id.*

The *Franks* decision then explained how the Tennessee Supreme Court views collections cases in the context of TCPA claims.  The discussion on whether these practices affect "trade" or "commerce" spans only three paragraphs.  *See id.* at 915.  The first paragraph rejects the argument that, under *Pursell*, collections practices never affect trade and commerce.  *Id.*  The second paragraph cites *Discover Bank v. Morgan*, 363 S.W.3d 479, 495–96 (Tenn. 2012),[15] and

---

[14] Section 104(b)(12) makes it unlawful to "[r]epresent[] that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law."  § 47-18-104(b)(12).

[15] In *Discover Bank*, a man had a credit card with defendant credit card company.  *Discover Bank*, 363 S.W.3d at 483.  After the man's death and because of the defendant's collections activities, the man's widow lost credit.  *Id.* at 483–84.  The widow sued under the TCPA, and the credit card company defaulted.  *Id.* at 484.  The Tennessee Supreme Court affirmed the lower court's refusal to set aside the default judgment.  *Id.* at 500.

*Searle v. Harrah's Ent., Inc.*, No. M2009-02045-COA-R3-CV, 2010 WL 3928632 (Tenn. Ct.

App. Oct. 6, 2010),[16] to clarify that Tennessee courts have applied the TCPA to collections

practices. *Franks*, 600 S.W.3d at 915. And the third paragraph notes that, interpreting and

construing the TCPA in accordance with the FTCA, the "[TCPA] should apply to collection

activities because courts have applied the [FTCA] to claims involving collection activities." *Id.*

(collecting cases)[17]; *see also* Tenn. Code Ann. § 47-18-115 ("It is the intent of the general

assembly that this part shall be interpreted and construed consistently with the interpretations

given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the

[FTCA], codified in 15 U.S.C. § 45(a)(1).").  It then added that whether a collections practice

---

[16] In *Searle*, the defendant casino harassed the plaintiff in its effort to collect on a dishonored
check. 2010 WL 3928632, at *1. In fact, the casino claimed the plaintiff violated a state
criminal statute, lied about having an original check in its possession, and stated that there were
pending criminal charges against—and an arrest warrant issued for—him. *Id.* at *12. So the
plaintiff sued under the former catch-all provision of the TCPA. *Id.* at *4, 11; *see* § 47-18-
104(b)(27) ("[E]nforcement of this subdivision (b)(27) is vested exclusively in the office of the
attorney general and reporter."). The court found that the transaction involved trade, commerce,
or a consumer transaction because "Mr. Searle went to Harrah's casino to gamble, which is
Harrah's trade, and Harrah's provided cash to Mr. Searle, in exchange for his $ 500 check, so that
Mr. Searle could engage in Harrah's trade -- to gamble in Harrah's casino." *Searle*, 2010 WL
3928632, at *11. The court characterized the defendant's efforts "to collect the erroneous debt"
as "a continuation of the consumer transaction." *Id.*
[17] The Court hesitates to consider the cases the Tennessee Supreme Court cites as interpretive
guidance for analyzing the "affecting the conduct of any trade or commerce" prong of the TCPA.
After all, the language on which the cited FTCA cases rely is the "deceptive acts or practices"
portion of the statute and not the "trade or commerce" part. *See FTC v. LoanPointe, LLC*, 525 F.
App'x 696, 700–01 (10th Cir. 2013); *FTC v. Check Investors, Inc.*, 502 F.3d 159, 174–75 (3rd
Cir. 2007), *abrogated on other grounds by Henson v. Santander Consumer USA, Inc.*, 582 U.S.
79 (2017); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979); *Spiegel, Inc. v.
FTC*, 540 F.2d 287, 290 (7th Cir. 1976); *Slough v. FTC*, 396 F.2d 870, 871-72 (5th Cir. 1968); *In
re Carlsbad Physician Ass'n*, No. 031 0002, 2003 WL 21043066, at *2 (F.T.C. May 2,
2003); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 529 (Alaska 1980). And the "trade or
commerce" part of the FTCA is the hook for Congress to legislate interstate commerce, which
seems somewhat different than its use in the TCPA. *See* U.S. Const. art I, § 8, cl. 3.

"affect[s] the conduct of any trade or commerce" is a "fact-intensive inquiry." *Franks*, 600

S.W.3d at 915 (quoting Tenn. Code Ann. § 47-18-104(a)).

Given *Pursell* and *Franks*, the Court now looks to the facts here and finds that the

Tennessee Supreme Court would hold that exercising the lien did not affect trade and commerce.

OJC alleged—and argues it proved[18]—that HYC misrepresented its agency status to port

authorities in its effort to exercise its lien over the nine containers. (*See* ECF No. 49 at 341; *see*

*generally* ECF No. 316.)  On the one hand, the lien here is linked to the consumer transaction

because it is a remedy set forth in the governing logistics contract. (*See* Ex. 3.)  And it is

arguably "a continuation of the consumer transaction."  *Searle*, 2010 WL 3928632, at *11.

But on the other hand, HYC has no consumer relationship with the port—the entity it

allegedly deceived.  And it is difficult—if not impossible—to characterize a misrepresentation in

the exercise of this lien as "the advertising, offering for sale, lease or rental, or distribution of any

goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles,

commodities, or things of value wherever situated."  § 47-18-103(24).  After all, retrieving

property securing an outstanding payment is not "advertising, offering for sale . . . or

distribut[ing]" any goods or services.  In fact, retrieving the property is not even part of HYC

performing its affirmative obligations under the contract; instead, it is HYC applying a

contractual remedy to OJC's failure to perform.  (*See* Ex. 3.)  And that collections practice is far

removed from the transaction for logistics services.

Weighing these competing positions and using *Pursell* and *Franks* as "available data" to

predict how the Tennessee Supreme Court would resolve this case, the Court finds the TCPA

does not apply here.  *See Faber*, 944 F.3d at 601 ("When the state's highest court hasn't

---

[18] The Court discusses the proof below.

addressed the issue, we must predict how it would rule by looking to all the available data."

(citations and punctuation marks omitted)).  The challenged collections practice—allegedly

misrepresenting facts to the port to gain access to the containers—is distinct from the earlier

consumer transaction and, under a "fact-intensive inquiry," does not "affect[] the conduct of any

trade or commerce" as the TCPA defines those terms.  *Franks*, 600 S.W.3d at 915; § 47-18-

104(a).

### 3.    Scope of Tenn. Code Ann. § 47-18-104(b)(3)

Lastly, the Parties dispute whether subsection 104(b)(3) of the TCPA applies to HYC's

conduct here.  The TCPA lists the unfair and deceptive practices for which private parties may

sue.  *See* § 47-18-104(b); *see also* § 47-18-109.  And of these possible claims, OJC argues that

subsection (b)(3) governs its claim here.  (*See* ECF No. 340 at PageID 5648–49; ECF No. 341 at

PageID 5686–88.)  That subsection declares it unlawful to "[c]aus[e] likelihood of confusion or

misunderstanding as to affiliation, connection or association with, or certification by, another.

This subdivision (b)(3) does not prohibit the private labeling of goods or services."  § 47-18-

104(b)(3).[19]  HYC urges the Court to interpret this subsection consistent with its legislative

history and similar statutes.  (ECF No. 310-1 at PageID 4333–36.)  And OJC counters that the

Court must use (b)(3)'s plain meaning, which it believes includes representations about agency.

(ECF No. 316 at PageID 4363–4364.)

In analyzing the scope of the statute, the Court's primary goal "is to carry out legislative

intent without expanding or restricting the intended scope of the statute."  *Coleman v. Olson*, 551

---

[19] The Tennessee Supreme Court has not opined on the scope of (b)(3).  And so, in deciding how
it would likely resolve the issue, the Court turns to "all the available data."  *Faber*, 944 F.3d at
601 ("In diversity cases, we are only bound by the forum state's highest state court. . . . When
the state's highest court hasn't addressed the issue, we must predict how it would rule by looking to
all the available data." (citations and punctuation marks omitted)).

S.W.3d 686, 694 (Tenn. 2018).  Practically speaking, this means courts begin with the statute's

plain language.  *See State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020).  And "[w]hen statutory

language is clear and unambiguous, we must apply its plain meaning in its normal and accepted

use, without a forced interpretation that would extend the meaning of the language."  *Id.*  This

also means that courts must give effect to all language in the statute.  *Yebuah v. Ctr. for

Urological Treatment, PLC*, 624 S.W.3d 481, 487 (Tenn. 2021) (explaining that "the first rule of

statutory interpretation is to effectuate legislative intent" and that "[t]his canon of statutory

interpretation prevents any word from being 'inoperative, superfluous, void, or insignificant'").

Courts therefore should not read statutes "in isolation" but should "read the statute 'as a whole . .

. in conjunction with [its] surrounding parts, and view [it] consistently with the legislative

purpose."  *Waggoner v. State*, 666 S.W.3d 384, 391 (Tenn. Ct. App. 2022) (quoting *Griffin v.

Campbell Clinic, P.A.*, 439 S.W.3d 899, 903 (Tenn. 2014)); *see also Falls v. Goins*, 673 S.W.3d

173 (Tenn. 2023).

    That said, the Court will consider (b)(3) by reading its plain language and its statutory

context.  It will look to the TCPA "as a whole," which has codified the "legislative purpose" and

directs courts to use the Federal Trade Commission Act as an interpretive guide.  *Griffin*, 439

S.W.3d at 903; Tenn. Code Ann. §§ 47-18-102, -115.  And it will interpret both sentences of

(b)(3) "in conjunction with" each other.  *Griffin*, 439 S.W.3d at 903.

    Emphasizing the idea of plain language, OJC contends that the statute encompasses

misrepresentations about agency status to third parties.  (ECF No. 316 at PageID 4363–64.)  In

support of this position, it turns to an unpublished case from the Tennessee Court of Appeals,

*Hall v. Eagle Rock Development, LLC*, No. E2015-01487-COA-R3-CV, 2017 WL 3233496, at *8

(Tenn. Ct. App. July 31, 2017).  (ECF No. 316 at PageID 4363–64.)  In *Hall*, the plaintiff buyer

22

asserted that the defendant seller, who "was a member of the entity selling the property," never disclosed his agency status before the closing. *Hall*, 2017 WL 3233496, at \*8. The Court of Appeals found that the agent's failure to disclose his affiliation with the seller could cause a likelihood of confusion or a misunderstanding as to the agent's affiliation. *Id.* And thus, the lack of disclosure amounted to a deceptive act under subsection (b)(3) of the TCPA. *Id.*

And *Hall* is not alone in using (b)(3) to challenge deception about agency relationships or other types of affiliation. *See Wilson v. State Farm Fire & Cas. Co.*, 799 F. Supp. 2d 829, 842 (E.D. Tenn. 2011) (addressing "plaintiffs' argument that State Farm engaged in deceptive practices by characterizing Joseph Construction as an independent third party with no connection to State Farm" and "conclud[ing] that the evidence does not preponderate towards a finding that State Farm or its agents misrepresented the relationship between State Farm and Joseph Construction"); *Tucker*, 180 S.W.3d at 119 (finding that "the record contains no evidence that any act or statement by All American misled Ms. Tucker about the relationship between All American and Sierra Builders. The All American employees provided truthful and accurate information to Ms. Tucker when they told her that Sierra Builders was one of its authorized contractors . . . ."); *McKeever v. Music City Frame & Collision Repair*, 2019 Tenn. Cir. LEXIS 286, \*5 (Twentieth Judicial Circuit Court of Davidson Cnty., Tenn. Dec. 18, 2019) (explaining that "having [individuals] on the property performing auto repairs, and advising customers, but not working for Defendant is likely to cause 'con[f]usion or misunderstanding as to the source, sponsorship, approval or certification of goods or services' and 'as to the affiliation, connection, o[r] association with, or certification by, another").[20]

---

[20] In each of these cases, the misrepresentation about agency was made to the consumer directly. The Parties here dispute whether a defendant must direct its deceptive act toward a plaintiff to prevail on a TCPA claim. (*See* ECF No. 316 at PageID 4361–63 (OJC arguing that "[t]he TCPA

But this sort of "plain language" interpretation of (b)(3) ignores half of the subsection's

sentences and the need to interpret the statute as a whole.  *See Culbreath v. First State Bank*

*Nat'l Ass'n*, 44 S.W.3d 518, 524 (Tenn. 2001) ("Over and over we have stressed that 'in

expounding a statute, we must not be guided by a single sentence or member of a sentence, but

look to the provisions of the whole law, and to its object and policy.'" (citation omitted)).  The

subsection's second sentence mimics the language of the Revised Uniform Deceptive Trade

Practices Act ("Uniform Act"), which was created before Tennessee enacted the TCPA.[21]

*Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9CV, 2003 WL 21780975, at *31–32

(Tenn. Ct. App. July 31, 2003).  With that in mind, the Court turns to the Uniform Act for

interpretive guidance.  *Heirs of Ellis v. Estate of Ellis*, 71 S.W.3d 705, 713 (Tenn. 2002) ("When

the legislature enacts provisions of a uniform or model act without significant alteration, it may

---

has no requirement that the deception or unfair practice be directed toward the plaintiff bringing
the claim"); ECF No. 310-1 at PageID 4331–32 (HYC arguing that the port authorities would
have to be the consumer because they received the misrepresentations).)  The Middle and
Eastern Districts of Tennessee have found that TCPA-violative conduct toward a third party may
allow an injured consumer to bring a claim.  *See Asurion, LLC v. SquareTrade, Inc.*, 407 F.
Supp. 3d 744, 751 (M.D. Tenn. 2019) ("The prima facie elements of a TCPA claim do not
require that the deceptive act be directed toward the plaintiff."); *Cloud Nine, LLC v. Whale*y, 650
F. Supp. 2d 789 (E.D. Tenn. 2009) ("[T]he prima facie elements for a TCPA claim do not require
that the deceptive act or practice be directed toward the plaintiff.  Instead, Tennessee courts have
recognized that 'plaintiffs asserting claims under the TCPA are required to show that the
defendant's wrongful conduct proximately caused their injury.'" (citation omitted)).  But the
only Tennessee case these federal district courts rely on is *Steamfitters Local Union No. 614
Health & Welfare Fund v. Philip Morris, Inc.,* No. W1999-01061-COA-R9-CV, 2000 Tenn.
App. LEXIS 644, 2000 WL 1390171, at *7 (Tenn. Ct. App. Sept. 26, 2000).  *Steamfitters* is
unpublished, from an intermediate court of appeals, and primarily focuses on the issue of
proximate cause.  *Id.*  Given the limited case law on this issue, the Court doubts that the
Tennessee Supreme Court would hold that misrepresentations to a third party qualify for TCPA
protections.  Even so, the Court declines to decide the issue here.  Instead, the Court will simply
assume that it applies, which favors OJC as the nonmoving party here.
[21] The Uniform Act makes unlawful conduct that "causes likelihood of confusion or of
misunderstanding as to affiliation, connection, or association with, or certification by, another[.]"
Uniform Act, § 2(a)(3)

be generally presumed to have adopted the expressed intention of the drafters of that uniform or model act."). The commentary to the Uniform Act provides that this subsection concerns the "likelihood of confusion caused by misleading trade names." *See* Uniform Act § 2(a)(2)–(3).

And Tennessee case law supports using (b)(3) to labeling or trade name disputes. *See McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 816–17 (M.D. Tenn. 2000) (finding no likelihood of confusion from use of certain trademarks but primarily analyzing the issue under the Lanham Act); *State ex rel. Slatery v. LLPS, Inc.*, No. M2022-00214-COA-R3-CV, 2023 WL 4345447 (Tenn. Ct. App. July 5, 2023) (applying (b)(3) to confusing mailers); *Chiusa v. Stubenrauch*, No. 3:21-cv-00545, 2022 WL 2793579 (M.D. Tenn. July 15, 2022) (applying (b)(3) to claims that the defendant used images, logos, and website features that overlapped with plaintiff company's marketing); *Masters Entm't Grp., Inc. v. Aurich*, No. 3:18-cv-1314, 2020 WL 13617690, at *3 n.5 (M.D. Tenn. Aug. 25, 2020) ("Plaintiff characterizes Defendants' conduct as violative of Tenn. Code Ann. § 47-18-104(b)(3), (5) & (8)). . . . In context, it is clear that any such alleged violations are based primarily, if not exclusively, on the alleged trademark infringement."); *Taylor v. Thomas*, No. 2:12-cv-02309-JPM-cgc, 2012 WL 12840225 (W.D. Tenn. Aug. 7, 2012) (denying dismissal of plaintiff's claims under (b)(3) related to service mark infringement).

Similarly, federal courts apply the TCPA the same way they apply the Lanham Act because both statutes "create[] a cause of action for those harmed by the 'unfair or deceptive act' of another." *See FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 459 (6th Cir. 2024) (describing "the TCPA's statutory-disparagement provision [under § 104(b)(8)] as a 'state law analog' to the false-advertising provision" of the Lanham Act and analyzing them "the same way"); *Moore v. Weinstein Co., LLC*, 545 F. App'x 405, 411–12 (6th Cir. 2013) (noting

25

in a § 104(b)(2) case[22] that "the same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition" under the TCPA); *McDonald's Corp.*, 82 F. Supp. 2d at 816–17 ("The same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the [TCPA]. . . . Under Tennessee common law regarding trademark and unfair practices, like federal trademark statutes, the ultimate question is whether the defendant has created a likelihood of confusion among consumers.").  And Lanham Act cases challenging practices that cause "likelihood of confusion" generally arise in service mark or trademark contexts.  *See, e.g.*, *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188 (6th Cir. 1997) (analyzing 15 U.S.C. § 1125(a)(1)).

For these reasons, given (b)(3)'s plain language and statutory context, the second sentence identifies the types of cases to which the first sentence should apply: cases related to labeling, trade dressing, logos, names, or similar marketing strategies that cause a likelihood of confusion or misunderstanding as to "affiliation, connection or association with, or certification by, another."  And because this is about none of those things but is instead about misrepresentations to a third party, the Court finds that the Tennessee Supreme Court would hold that OJC's reliance on subsection (b)(3) is misplaced.  As a result, OJC lacks a cause of action here.

---

[22] Subsection (b)(2) is extremely similar to (b)(3).  It prohibits "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services.  This subdivision (b)(2) does not prohibit the private labeling of goods and services." Tenn. Code Ann. § 47-18-104(b)(2).

### 4.    Summary of the Legal Challenges

Throughout the trial, the Court questioned whether, or how, the TCPA would apply here. (*See, e.g.*, ECF No. 340 at PageID 5647–5653 (oral motion for judgment as a matter of law and discussion of whether the TCPA claim is viable); *id.* at 5651 ("But it's kind of removed from your role as consumer.  It's a bit of a tangent, if you will.  There may be other causes of action related to it, I just think folding it into the Tennessee Consumer Protection Act feels like a stretch."); ECF No. 341 at PageID 5679 ("[T]he TCPA claim in my view is such a stretch.  But for the life of me I haven't seen a case yet that would limit the deceptive act to the actual consumer. . . . So I also believe, you know, that that is -- that's a flawed claim.").)  And in the end, the Court chose "to let the jury wrestle with that."  (ECF No. 341 at PageID 5679.)  But that was an error.  The Court should not have let this claim go to the jury.

As discussed above, OJC's TCPA claim fails on at least three separate legal grounds. And the claim would still fail even if OJC were right as to each of its positions about the individual issues—being a "consumer," that the misrepresentations "affect[ed]" "trade or commerce," that (b)(3) applies to non-labeling cases, and that misrepresentations to third parties are within the scope of the TCPA.  This is because, even if each case OJC cited to support its position were persuasive and governing on the single issue before each of those courts, OJC provides no case (and this Court has found none) that combines each of those challenges into a single fact scenario.  Put another way, *ATS* may stretch how Tennessee defines a "consumer," and *Franks* may extend the definition of "trade or commerce," but neither pushes the limits of the TCPA on both issues.  In contrast, the facts here challenge the scope of the TCPA on *every* issue.  For this reason, even if the Court is wrong in its predictions about how the Tennessee

Supreme Court would handle every issue raised here, this Court still finds that it would reject

OJC's attempt to assert the TCPA claim under these facts.

As a result, OJC's TCPA claim fails, and the Court **VACATES** the TCPA jury award.

### 5. Sufficiency of the Evidence

Besides its legal shortcomings, OJC's TCPA claim also fails for insufficient evidence.

Of course, the Court may not "weigh the evidence, question the credibility of witnesses, or

substitute [its] own judgment for that of the jury." *Schlosser*, 113 F.4th at 683 (citation omitted).

But it is appropriate to "render judgment as a matter of law when 'a party has been fully heard on

an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that

party on that issue.'" *Id.* (citation omitted). The Court has already discussed why the verdict on

the breach of contract and lien issues stand. And OJC did not challenge that the jury could

reasonably come to that conclusion, although it disagreed that HYC gave proper notice of its

intent to exercise the lien. Given that finding, the evidence does not support a TCPA violation

here.

OJC introduced testimonial and documentary evidence in support of its argument that

HYC breached the contract first. And had HYC done so, it would have no valid basis to retrieve

the containers from port. After all, it would be neither agent (because OJC terminated HYC's

agency) nor lienholder (because Section 14 of the contract would not apply), so it would have no

right to the containers at all. (*See* Ex. 3.) *See White*, 395 S.W.3d at 715 ("A party who has

materially breached a contract is not entitled to damages stemming from the other party's later

material breach of the same contract." (quoting *McClain*, 806 S.W.2d at 199)). In that case, the

mere fact that HYC picked up the containers would be enough to show that HYC, at least by

omission, deceived port authorities about its right and authority to pick up the containers. As a

result, had OJC prevailed on its breach of contract claim, it also would have prevailed on its

TCPA claim.

But OJC did not prevail on the breach of contract claim. The jury found in favor of

HYC. Just because the jury held that OJC breached the contract first does not necessarily

preclude OJC from prevailing under the TCPA. But assuming it had a legally valid TCPA claim,

as discussed above, it would need to prove more than that HYC simply retrieved the containers.

It would also need to prove that HYC misrepresented a fact about its status to the port. After all,

as the jury held, HYC was a lienholder with a right to the containers.

In the end, the jury found that OJC breached the contract first, giving rise to this second

scenario. Yet OJC failed to introduce proof about what happened at the port. It did not elicit

testimony from HYC showing that HYC told 562 Express to lie to the port personnel. It did not

call the 562 Express employees who interacted with the port authorities to ask what they said or

did, or what they did not say or do, at the port. Nor did it call anyone from the port authority to

testify about what 562 Express said or did at the port. As a result, OJC relies on speculation

rather than proof that HYC, through its agent 562 Express, misrepresented its authority to the

port. To be sure, 562 Express may have misled the port by saying it was OJC's agent. But it just

as easily could have told the port that it was a lienholder. It even may have done no more than

flash a badge or sign a form. Without any evidence other than OJC's belief and speculation that

562 Express relied on deception when picking up the containers, considering the evidence in the

light most favorable to OJC, no reasonable jury could find that HYC misrepresented anything to

the port authorities. For that reason, the Court again erred when it allowed the jury to consider

this claim as part of its verdict.

Of course, OJC disagrees with this analysis, emphasizing that HYC is trying to distract the Court with "hypotheticals." (*See* ECF No. 316 at PageID 4367.) But OJC did the same thing to the jury with its speculation. Given the breach of contract and lien findings, there is no evidence but its own uncorroborated hearsay account of what happened at the port to support finding a TCPA violation. What is more, OJC argues that the emails terminating HYC's agency, Weiss's testimony about those emails, and Silver's responses to the termination are evidence of misrepresentation. (*Id.* at PageID 4366–67.) But they are not. They are evidence that HYC was no longer OJC's agent. But this is not enough to prove that HYC misrepresented its status at the port. OJC needed to offer evidence that HYC relied on that agency relationship at the port.

In this respect, OJC claims that the DeWell delivery notices from the shipping company "show that HYC was authorized to pick up the nine containers because [HYC] was designated as the transport company for OJC." (*Id.* at PageID 4367; *see* Ex. 3.) This is true. (Ex. 35 (delivery notices naming "HYC Logistics Inc" as the "Transport Company"); *see also* ECF No. 339 at PageID 5149.) But it is also true that 562 Express is not listed on the notices. For that reason, this still does not prove that the California port relied on these delivery notices when it allowed 562 Express to pick up the containers. As noted, it is just as possible that the port gave 562 Express access to the shipment because 562 Express claimed to be a lienholder.

OJC next argues that Weiss "testified that the port would not have allowed HYC or its agent 562 Express to pick up the nine containers if he had called and told them OJC had terminated its agency contract with HYC."[23] (ECF No. 316 at PageID 4367.) Weiss did testify

---

[23] It is somewhat unclear to what testimony OJC refers. The Parties renewed their motions for judgment as a matter of law before ordering and receiving a transcript, so they do not support their arguments with specific citations. The trial transcript alone is over 1,000 pages. (ECF Nos. 337–41.) And there are 48 exhibits. (ECF No. 298.) The Court has thus construed this

to this point. (ECF No. 340 at PageID 5562–63 ("I guess I can call the terminal and say, I'm the cargo owner, cancel -- force cancel the appointment. But the regular process is when your agent makes an appointment, they're the ones to go in.").) But, as with his other arguments, this does not prove, but only speculates about, misrepresentation. Maybe the port would have stopped 562 Express from picking up the containers if Weiss had told them to, but maybe they would have turned the containers over to a lienholder. In any case, he did not call the port. (*See id.* (testifying in hypothetical terms).) So there is still no evidence that 562 Express misrepresented anything in its effort to retrieve the containers.

Weiss also testified that, "to go into the term[inal] they have to say that they are the agent of the cargo owner for the particular container." (*Id.* at PageID 5486.) But this testimony does not get a reasonable factfinder to the conclusion that 562 Express misrepresented its agency status to the California port because it is speculation. Weiss was not at the port, does not coordinate pick-ups from the port (but hires logistics companies to do so) (ECF No. 339 at PageID 5151–52), and presented no evidence about what happened at the port. And so, this Court finds that no reasonable jury could find that Weiss knew whether the port required every trucking company to state their agency status. This is the sum of all evidence OJC relies on to show that HYC misrepresented its status to the port authorities. It is not enough.

For these reasons, the Court finds that OJC's TCPA claim fails for insufficient evidence because no reasonable jury could find in its favor. Given the lien and contract findings, the jury could not infer misrepresentation solely from HYC picking up the containers. And given the lack of evidence about what happened at the port, the jury had no other basis for finding

---

argument to refer to the testimony cited in this section, which it believes most closely reflects OJC's position.

misrepresentation.  OJC's TCPA claim, therefore, fails, and the Court **VACATES** the TCPA award.

## B.    Treble Damages

Because the TCPA claim is not viable under these facts, OJC is not eligible for treble damages, so the Court need not address the merits of its request for them.  And so the Court **DENIES** OJC's motion as moot.  All the same, the Court will explain why it would have denied the motion on the merits.

First, OJC's motion focuses on HYC charging per diems and accessorial fees.  (*See generally* ECF No. 304.)  But these fees are not a reason to award treble damages.  This is because the per diems and accessorial fees have no relation to the conduct that OJC claims violated the TCPA—that HYC misrepresented its agency status to the port authorities.  *See* Tenn. Code Ann. § 47-18-109(a)(3) (authorizing treble damages where "the use or employment *of the unfair or deceptive act or practice* was a willful or knowing violation" of the TCPA (emphasis added)).[24]  (ECF No. 49 at PageID 341; ECF No. 299 at PageID 4229.)

---

[24] OJC cites *Am. Nat'l Prop. & Cas. Co. v. Stutte*, 105 F. Supp. 3d 849, 854 (E.D. Tenn. 2015), as support for considering post-litigation conduct in the bad faith analysis.  (ECF No. 304 at PageID 4279.)  But that case, which asked whether the defendant denied an insurance claim in bad faith, explained the limited relevance of litigation conduct:

> One final note of clarification is necessary: the Court holds that [the defendant's] post-litigation conduct may be relevant to whether its decision to deny the [plaintiffs'] claim was in bad faith, but only insofar as it relates to the claim or refusal to pay.  Conduct or strategy related to the litigation process is not a proper basis for a bad faith finding.  See *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 520–23 (Ky. 2006).

*Am. Nat'l Prop.*, 105 F. Supp. 3d at 854.  And the Court finds that OJC's argument that filing multiple motions to compel or receiving incorrect bills "relates to the claim [of misrepresentations at the port]" stretches this limited holding too far.

Second, even if OJC relies on HYC's alleged misrepresentations to port authorities for its motion for treble damages, the Court still would find that treble damages are improper here. *See* § 47-18-109(a)(3). Assuming, without deciding, HYC's conduct was "knowing" or "willful"[25] under the statute, courts ruling on whether to award treble damages under the TCPA consider, among other things,

(A) The competence of the consumer or other person;
(B) The nature of the deception or coercion practiced upon the consumer or other person;
(C) The damage to the consumer or other person; and
(D) The good faith of the person found to have violated this part.

---

[25] Although the Court will not decide the issue, it is doubtful HYC's conduct rises to the level of "knowing" or "willful." For example, OJC contends that "[t]he 'objective manifestations' by HYC show that it had no intention of ever delivering those goods to OJC, and it did not do so after taking them from the port." (ECF No. 304 at PageID 4278.) But HYC's conduct objectively shows it did intend to deliver the goods—once OJC paid for HYC's services. After all, OJC breached the contract first, and HYC properly exercised its lien by following the contract's provisions and providing notice to OJC. And consistent with the contract, HYC did not need to return the containers to OJC until OJC took the proper steps for their return, like posting bond or a letter of credit. (*See* Ex. 3 (contractual methods of terminating the lien).) OJC never took these steps, so it makes sense that HYC never returned the containers.

And as far as OJC challenges HYC's billing—which, as noted, has questionable relevance in this analysis—it is similarly doubtful that such conduct was "knowing" or "willful." This is because, even if the accessorial charges are relevant to treble damages, the Court cannot say which fees were inappropriate or why, making it a difficult basis for enhancing damages. True, OJC presented some evidence that HYC double charged a few thousand dollars. (*See, e.g.*, ECF No. 338 at PageID 4978 (Silver testifying that the invoice charging for a waived per diem fee was a "mistake").) But then OJC speculates that the lost recovery was for every per diem charge. (*See* ECF No. 303 at PageID 4252.) At trial, OJC also challenged charges for chassis, bobtails, and congestion fees, so a part or combination of these charges could have been the basis for the amount the jury did not award to HYC. And HYC's witness Aranov testified that some charges were not waived until after HYC sent its invoices to OJC, meaning they were not wrong at the time of billing but should have been credited to OJC's account later. As much as certain per diems were improper, Uri Silver testified that those bills had "mistakes," which is a far cry from "knowing" or "willful" billing errors. Given this testimony and the large amount of invoice evidence from which the jury could have discovered billing errors, the Court lacks clear answers about which charges serve as the basis of OJC's claim for treble damages. And without that clarity, it is hard to say whether those billing practices were "knowingly" or "willfully" deceptive or unfair.

§ 47-18-109(a)(4).

The first factor favors HYC because OJC imports goods from China and its founder and CEO Jacob Weiss has extensive experience contracting for logistics services. In fact, he testified that he founded the company around 2009 and that he had worked with many logistics businesses before he contracted with HYC. So his competence in the logistics business steers the Court away from awarding treble damages. As to the second factor, the jury confirmed that OJC breached the contract first, that HYC had a right to retrieve the containers under the lien, and that HYC did so through proper notice to OJC. (ECF No. 302.) The nature of the deception (if any) therefore was minimal and disfavors treble damages. After all, HYC had a lien right to possess the containers, so, as noted above, the evidence does not support a finding that it deceived port authorities by claiming it could retrieve them. The only possible deception would be if it claimed that it was OJC's agent.

And under the third factor, because HYC had a contractual lien right over the containers and could retrieve them even without agency authority, OJC's damages resulting from the misrepresentation to port authorities were also minimal. Indeed, OJC voluntarily gave HYC a lien right over the containers when it contracted with HYC. And the fact that HYC exercised this right, even though OJC wanted to prevent it from doing so, does not make OJC's damages significant. Lastly, the fourth factor also favors HYC. Even if the email from Weiss gave HYC notice that OJC had terminated its agency authority, OJC still owed HYC a large amount of money for past services. And HYC still had a right to take the containers under the contract. These facts likely mean that HYC acted in good faith to exercise its lien even if it misled the port authorities in the process.

34

For these reasons, even if the TCPA award could stand, the Court would not award treble damages under § 47-18-109(a)(4).

C.    **Electing Damages**

As a final matter, the Court addresses how this ruling impacts OJC's overall recovery. HYC argues that OJC cannot recover for misrepresentation[26] because it moved for treble damages under the TCPA. (ECF No. 308 at PageID 4292 ("[B]y virtue of OJC's election to pursue the damages awarded under its TCPA claim, OJC foregoes its remedy and/or damages for 'intentional and/or reckless misrepresentation' in the amount of $238,279.45 which is now gone and of no force or effect against HYC.").) To support this argument, HYC cites *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906–09 (Tenn. 1999). In *Concrete Spaces*, the Court held that punitive and treble damages, which both punish and deter a wrongdoer, constitute double recovery for the same wrong. *Id.* As a result, a party cannot recover both. *Id.* HYC is therefore correct to interpret *Concrete Senders* as "prevent[ing] double redress for [a] single wrong and requir[ing] plaintiff to choose one theory or recovery under which to proceed." (ECF No. 308 at PageID 4292.) *See also Concrete Spaces*, 2 S.W.3d at 906–09 (prohibiting double recovery).

---

[26] To clarify, reading the jury verdict as internally consistent, the misrepresentation finding was based on facts separate from those underlying the TCPA finding. And this interpretation tracks with OJC's reading of the verdict. (ECF No. 303 at PageID 4261 ("The only consistent way to read the verdict in this case is that the jury found that OJC failed to timely pay for some portion of the invoices, but then, HYC committed fraud in response by sending the per diem invoices to OJC. . . . The jury then determined that HYC committed a deceptive or unfair trade practice when it sent 562 Express to pick up the nine containers after the agency contract had been terminated."); *id.* at PageID 4262 ("Based on the jury instructions and applicable Tennessee law on the misrepresentation claim, the jury necessarily determined that HYC made false representations knowingly or recklessly without knowing whether it was true or false when HYC sent invoices to OJC.").) *See also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962).

But HYC is wrong that *Concrete Spaces* somehow means OJC can no longer recover under misrepresentation here.

First, *Concrete Spaces* precludes recovering *punitive damages and treble damages* for the *same misconduct*. *Concrete Spaces*, 2 S.W.3d at 906–09 (emphasis added); *see also* Tenn. Code Ann. § 47-18-109(a)(3) (stating that "the court may not award exemplary or punitive damages for the same unfair or deceptive practice" justifying treble damages). But here, even if OJC could recover treble damages for its TCPA claim, those damages would not doubly punish the same wrongdoing because the verdict awarded OJC compensatory damages (not punitive damages) on its misrepresentation claim. (*See* ECF No. 302.) Plus, as explained above, the claim for misrepresentation focused on different conduct (inflating the per diem charges) than the TCPA claim (alleged misrepresentation at the port).

Second, since the Court is vacating the TCPA award, there is no double recovery on a compensatory level, either. *See Concrete Spaces*, 2 S.W.3d at 909 ("[N]o danger of double recovery exists unless the plaintiff actually realizes satisfaction of both forms of enhanced damages."). Instead, there will be recovery only for compensatory damages on the misrepresentation claim—which HYC does not argue was an improper question for the jury. (*See generally* ECF No. 310-1.) Third, *Concrete Spaces* allows a party "to select an award of damages after the judge and jury have decided all the issues surrounding liability and the entitlement and amount of enhanced damages." *Concrete Spaces*, 2 S.W.3d at 908. This Order on OJC's motion for treble damages is the final decision on its "entitlement [to] and amount of enhanced damages," so OJC still can elect to recover under misrepresentation rather than under the vacated TCPA claim.

It is also important to note that, although OJC may be able to recover compensatory damages for HYC's misrepresentation, it cannot recover any punitive damages. (ECF No. 265 at PageID 3873.) This is because OJC waived the issue when, at trial, it declined to have the jury deliberate on the question of punitive damages as a second, bifurcated portion of trial.[27] That said, even if OJC had attempted to proceed on punitive damages, such an award likely would not have had support in the evidence. After all, for a party to recover punitive damages, it must prove by "clear and convincing evidence that a defendant has acted intentionally, recklessly, maliciously, or fraudulently." Tennessee Model Jury Instructions 14.55A; *see also Goodale v. Langenberg*, 243 S.W.3d 575, 588 (Tenn. Ct. App. 2007) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) ("[A] plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.")). And OJC did not carry this burden.

The Court repeatedly noted that it was a close call whether to instruct the jury on fraud and misrepresentation. And at trial, the Parties presented radically different testimony about what happened. In the end, a reasonable jury could—and did—find by a preponderance of the evidence that HYC engaged in misrepresentation based on HYC's charges in its invoices, but there was not clear and convincing evidence to support such a finding. *See Goodale*, 243 S.W.3d at 588–89 (stating that the *Hodges* court "defined clear and convincing evidence as that 'in

---

[27] OJC requested a punitive damage instruction multiple times (*see, e.g.*, ECF No. 340 at PageID 5386–87), but the Court did not give one (*see* ECF No. 299). After the jury returned a verdict for OJC on misrepresentation, OJC again requested the instruction. (ECF No. 341 at PageID 5814.) This time, the Court offered to give it to the jury and have them return to deliberations. (*Id.*) OJC then changed its mind and told the Court that it would "leave it as is" rather than call the jurors back in. (*Id.* at PageID 5815.)

which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence'").

For these reasons, the Court **GRANTS** HYC's motion for judgment as a matter of law on the TCPA claim and **VACATES** the damages award under the TCPA. But the Court holds that OJC still can recover compensatory damages for the misrepresentation claim.

## CONCLUSION

For the reasons explained, the Court **DENIES** OJC's Motion for Judgment as a Matter of Law on the contract and lien claims. (ECF No. 303.) And the Court **GRANTS** HYC's Motion for Judgment as a Matter of Law on the TCPA claim (ECF No. 310) and **VACATES** the related damages award. As a result, the Court also **DENIES** as moot OJC's Motion for Treble Damages on the TCPA claim (ECF No. 304) and HYC's Motion to Alter Judgment (ECF No. 321). The Court will enter an Amended Judgment consistent with this Order.

HYC also has three pending motions for attorney's fees related to travel reimbursement[28] and has stated that it plans to move for attorney's fees authorized under the contract. Consistent with Federal Rule of Civil Procedure 54(d)(2) and the Court's earlier order extending the motion deadline (ECF No. 315), the Court **ORDERS** the Parties to move for attorney's fees on or before July 14, 2025. The motions should incorporate all fees the Party seeks, including the amounts related to the reimbursement issue.[29]

---

[28] OJC moved to continue trial after HYC's witness Uri Silver was already en route to the United States for trial. (*See* ECF Nos. 270, 271, 284.) As a result, HYC moved for reimbursement of Silver's travel expenses and the attorney's fees related to recovering those expenses. (ECF Nos. 284, 307, 319.) At a status conference on April 10, 2025, the Parties stated that they would resolve the reimbursement issue but would not agree on the related attorney's fees. (*See* ECF Nos. 332, 335.)

[29] The Court therefore **DENIES** as moot HYC's motions related to reimbursement and attorney's fees. (*See* ECF Nos. 284, 307, 318, 319.)

**SO ORDERED**, this 26th day of June, 2025.

s/Thomas L. Parker
_____
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE